John **BARRETT**, Sabrina Barrett, Lars Bengston, Cynthia Bengston, Gilbert Bennett, Karen Bennett, Pauline Borski, Joe Cantu, Rosemarie Cantu, Louie Casias, Sr., Patti Casias, John Christensen, Kristy Christensen, Gudrun Colon-Pomales, Kenny Dingle, Kathy Dingle, Kurt Ditges, Elke Ditges, Adam Farris, Annie Farris, James Fish, Joan Fish, Charles Jackson, Cynthia Jackson, William Jacobs, Anita Jacobs, John Langman, David Love, Tammie Love, Dan Patterson, John Pop, Melena Pop, Peter Reaux, Jeannette Reaux, Charlie Riley, Deanne Riley, Jeffrey Schultz, Timothy Sisk, Allison Sisk, Kevin Stanfill, Carmen Stanfill, M.C. Terdin, Cynthia Sykora, Steve Thumann, Adelcida Thumann, Jeffrey Turner, Tenisa Turner, Richard Yeates, and Sonja Yeates, Appellants and Cross–Appellees,

v.

UNITED STATES BRASS CORPORATION, Appellee and Cross–Appellant.

No. 01–91–01279–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 19, 1993.

Opinion Overruling Motions for Rehearing Oct. 14, 1993.

Mike O'Brien, P.C., Mike O'Brien, Fleming, Hovenkamp & Grayson, George M. Fleming, Mark A. Hovenkamp, James R. Moriarty, P.C., James R. Moriarty, Houston, for appellants.

Nelson & Zeidman, Kurt T. Nelson, Mark R. Zeidman, Loreta H. Rea, Houston, for appellee.

Before SAM BASS,* DUNN and PRICE,** JJ.

## OPINION

SAM BASS, Justice.

The appellants appeal from a final judgment denying them recovery under the Deceptive Trade Practices Act (DTPA)[1] and granting the appellee, United States Brass Corporation (U.S. Brass), judgment notwithstanding the verdict on their DTPA cause of action. U.S. Brass brings cross-points challenging the appellants' recovery on their negligence cause of action and any potential recovery on their DTPA cause of action.

We are asked to decide three issues: (1) Should the 23 appellants who recovered under negligence be allowed to recover under their DTPA cause of action? (2) Should the four appellants who received a take-nothing judgment be allowed to recover under their DTPA cause of action? (3) Should one or more of the 23 appellants be denied recovery under their negligence cause of action?

The judgment of the trial court is affirmed in part and reversed in part. The detailed disposition is set forth in the conclusions at the end of this opinion.

### Summary of the Procedural History

On December 19, 1988, these 27 appellants were among several hundred plaintiff homeowners who sued nine defendant companies, including U.S. Brass, alleging that they had misrepresented the polybutylene plumbing systems installed in the plaintiffs' homes to

---

* The Honorable SAM BASS, retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

** The Honorable FRANK C. PRICE, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

1. Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon 1987).

code bodies, homebuilders, and city officials. The plaintiffs brought causes of action based on violations of the DTPA, negligence, and strict liability. They sought damages, claiming the plumbing system leaked, necessitating its repair and replacement and causing personal injuries, including mental anguish, property damage, and diminution in the value of their homes.

The trial court divided the plaintiffs into two groups. These 27 appellants were in a group of 36 homeowners [2] who went to trial as a test group. All defendants, except U.S. Brass, settled with this group, either before trial, or after the verdict but before judgment was entered. U.S. Brass moved for, and received, a directed verdict with respect to nine plaintiffs.[3] With four exceptions,[4] the jury found in favor of these 27 appellants on their negligence and DTPA causes of action. Two [5] of these who did not receive favorable findings, moved for judgment notwithstanding the verdict, which was denied, while U.S. Brass' motion for judgment on the verdict with respect to all four was granted.

Twenty-three plaintiffs of the 36 moved for judgment in accordance with the verdict and elected to recover under the DTPA. The trial court denied these motions, granted U.S. Brass' motion for judgment notwithstanding the verdict and to disregard the jury's answers to questions one through six on the plaintiffs' DTPA cause of action, and entered judgment for the 23 plaintiffs based on the jury verdict on their negligence cause of action. The trial court also entered a take-nothing judgment against 13 of the plaintiffs: the four who did not receive favor-

able jury findings and the nine against whom a verdict was directed. The 23 plaintiffs recovering under negligence and these four appeal the judgment against them on their DTPA cause of action.

## Summary of Relevant Facts

A polybutylene plumbing system consists of molded plastic (Celcon) insert fittings, polybutylene pipe extruded from polybutylene resin, and aluminum or copper crimp rings. Plumbers install the plumbing system by placing the crimp ring over the end of the pipe, pushing the fitting inside the pipe, and then using a crimp tool to crimp the ring around the outside of the pipe and fitting. The pressure from the crimp ring deforms the pipe and the fitting to make a water-tight seal with the fitting. The defendant companies either made the polybutylene or plastic, molded the fittings from the plastic, or extruded the pipe. In particular, U.S. Brass [6] designed and molded the fittings from the material, Celcon, provided by Hoechst Celanese Corporation (Celanese), extruded pipe from the polybutylene resin provided by Shell Oil Company (Shell), designed the plumbing system, designed the crimping tool, and issued instructions for assembling the system and using the crimp tool. U.S. Brass sold the fittings and pipe to wholesalers, that is, plumbing supply houses. The wholesalers sold to other wholesalers, plumbers, or whoever else had use for it. Homebuilders contracted with plumbing subcontractors to furnish and install plumbing systems in the homes.

2. For purposes of this number, a husband and wife are counted as one because they own a single home. The 36 were the Amstadts, the Askins, the Barretts, the Bengstons, the Cantus, the Christensens, the Bennetts, Pauline Borski, Daniel Campbell, the Casiases, the Changs, Gudrun Colon–Pomales, the Dingles, the Ditges, the Farrises, the Fishes, the Fitches, the Jacksons, the Jacobses, the Kirbys, John Langman, the Leodlers, the Loves, the McQuaides, Cheryl Mallett, Dan Patterson, the Pops, the Reauxes, the Rileys, Jeffrey Schultz, the Sisks, the Stanfills, Terdin and Sykora, the Thumanns, the Turners, and the Yeateses.

3. Robert and Toni Amstadt, James and Richelle Askins, Daniel Campbell, Kung San and Sue Chang, Samual and Deborah Fitch, B.D. and

Wanda Kirby, Paul and Kathy Loedler, Cheryl Mallett, and Mark and Kelly McQuaide. They do not appeal.

4. Gudrun Colon–Pomales, Dan Patterson, Steve and Adelcida Thumann, and Richard and Sonja Yeates. They received a take-nothing judgment on the DTPA and negligence causes of action, but they do not challenge the judgment adverse to them on the negligence cause of action.

5. Colon–Pomales and the Thumanns moved for a JNOV.

6. U.S. Brass bought a company known as Qest Product, which made the Celcon fittings. "Qest" is also a reference to U.S. Brass.

The homes of the 27 appellants were built between 1978 and 1985 by homebuilders, Monarch, Fox & Jacobs, Wood Brothers, Weekley, Great American, NPC, Genex, or Champion, in various subdivisions, and bought by the appellants between 1982 and 1988.[7] Some of the appellants purchased their homes "new" from the builder; others purchased them from a previous owner or as a foreclosure. The homes all had polybutylene plumbing systems. One hundred percent of the fittings in four of the homes were made by U.S. Brass (Qest). Two of the homes had no U.S. Brass fittings. In the remaining homes, anywhere from nine percent to 95 percent of the fittings were made by U.S. Brass (Qest).[8] Almost all of the homes experienced one or more leaks in the plumbing system.

What physically caused the leaks? The evidence at trial was conflicting.

Watson was a former U.S. Brass employee who had managed the operations of the U.S. Brass plant in Elkhart, Indiana, and worked on failure analysis of Qest fittings during 1982. He retired from the company at the end of 1982. He testified by deposition that, in his opinion, the leaks in the system were caused by misapplication or abuse, that is by installation error. He defined misapplication as the use of tools that had been gauged incorrectly or not gauged, tools applied to the ring and the fitting at an angle or double crimped, doing things that were not specified or were actually warned against in the literature, or failing to follow instructions or common sense. He also saw evidence of chemical attack, which Celanese confirmed in some instances. The most common attack came from solder flux, used to ease assembly of the components, and cleaning compounds. He also testified that "excessive forces" needed to be guarded against, but stated that the design parameters of the plumbing system were such that the material was not overstressed. He admitted that some of the returned goods showed a production problem or manufacturing error, but stated the instances were minor and constituted a tiny fraction of total production. Watson had not examined any of the fittings in this litigation.

Chudnovsky, the plaintiffs' expert witness, testified that the failures were caused by a combination of chemical degradation and stress. He said the chemical degradation led to the formation of micro-cracks, that the chemical degradation was accelerated by stress, and that the stresses were the immediate cause of crack propagation. He based his opinion on an examination of a sampling of the fittings in the case, as well as a review of documentation. He said he had not done any testing to determine if the mechanical forces alone involved in producing the fitting and in installing the fitting would produce a premature failure. But he also stated the system as designed, was designed to fail, even if properly installed. He also stated that in the fittings he had examined, one leak had occurred where the pipe and fitting had pulled away from each other because the crimp ring wasn't compressed hard enough; others had happened because of nonplastic plumbing failures; and in a very few examples, a residual splitting had appeared in the pipe itself. Chudnovsky also stated that, in his opinion, Celcon was an unsuitable material because it basically fails and is not reliable. He said it was false that Celcon had a 50-year life, was durable, and would not corrode.

Stivala, another expert witness for the plaintiffs, visually examined the fittings and tested them to determine if the molecular weight on the inside was different from that on the outside, indicating that degradation as a result of chemical reaction had occurred in the interior. He testified that Celcon was not suitable as an insert fitting in a polybutylene plumbing system in the particular community because it is inherently susceptible to oxidation, and so long as the water contained any medium that could oxidize the surface, it would do so. He stated a Celcon fitting would not last 25 years in any community that adds chlorine to its water and that it would corrode and fail. However, he admitted on cross-examination that the degra-

---

7. Six of the homes were built before June 1982; 10 homes were built after June 1982. The construction dates of 11 homes are unknown.

8. U.S. Brass was not the only manufacturer of polybutylene plumbing systems. Two of its competitors were Vanguard and Admiral Marine.

dation had not gone beyond the surface layer and that he had not done testing to determine if there was any connection between the degradation and the failure of the part.

Thames, another expert witness for the plaintiffs, looked at failed fittings visually and by Fourier transform infrared spectroscopy. He determined that the white material on the inside of the fitting was degraded Celcon. He also compared the area of the fitting where the crimp ring had been and an area where there was no crimp ring. He stated both were cracked, where there was crimping pressure and where there was not. He testified that Celcon was not suitable for use as a fitting in the application, that it was not reliable, and that it would not last when exposed to hot, chlorinated water for an extended period of time. He admitted that in the fitting he examined under the electron microscope, the crack had not gone through the wall of the fitting yet.

Kardos, Celanese's expert witness, looked at fittings from all the plaintiffs' houses. He testified that the causes of fittings failures were cracks that had gone through the wall of the fittings. There were two kinds of cracks: those that ran from the inside to the outside of the fitting and those that ran from the outside to the inside. He stated those that ran from the inside to the outside were more prevalent and primarily located underneath the crimp ring. In his opinion, the cracks came from overstressing, which had four major sources: (1) overcrimping the ring; (2) placement of the crimp ring too close to the shoulder; (3) cocking of the tool during closure of the tool; and (4) bending of the entire fitting nipple after the tube and crimp have been installed. He said a crack did not necessarily go all the way through the fitting wall at the time the fitting was overstressed. If the stress was not high enough to keep the crack going, later temperature and performance fluctuations would stress and load the crack slowly through the system, ultimately causing the crack to go through the fitting some months or even years after installation. Kardos was unfamiliar with the fitting manufacturers' installation instructions and had no opinion about whether the installation errors or mistakes

were warned against in the instructions. He testified that the whitened inner surface of the fitting—degraded Celcon—did not cause the cracks that caused leaks in the houses. He was unable to say which of the fittings leaked, pointing out it was difficult unless a person saw the sediment coming out from underneath the tubing. Kardos testified that Celcon could be used in properly designed and installed parts in potable water, including chlorinated water systems, pointing out that the same material is being used in compression fittings with no problem.

What representations did U.S. Brass make?

Manis had been a manufacturer's representative for U.S. Brass from 1979 to 1984. It was his function to set up plumbing supply houses. He did not sell directly to builders or plumbers. He was paid a commission. He made presentations about the polybutylene plumbing system to code bodies, city officials, builders, and plumbing contractors. Manis said he sat in on meetings with the Houston Plumbing Review Board two or three times, and gave the board Qest catalogs. He did not recall the dates of the meetings. Manis did not recall meeting with any of the builders of the homes involved in this litigation, except for Great American. Manis agreed he probably used plaintiffs' exhibits 117, 118, 120, 121, and 122 in making presentations about the plumbing system. He was asked:

Q: How long will a polybutylene plumbing system last? You were asked that question and you gave out these brochures [PX 117] before, right, sir?

A: I gave them out, yes.

Q: And the answer was: "Tests by independent testing laboratories and authorities project a normal life of 50 years. Over a million houses and recreational structures have been built or manufactured using polybutylene plumbing within the last 10 years and service problems have been virtually nil." That was basically your answer, right?

A: Yeah, that might have been.

Manis also admitted he would have used a Qest catalog (PX 120), and he would have made the kinds of representations it dis-

cussed—positive connections quicker, easier and no corrosion.

Plaintiffs' exhibit 117, a Qest question-and-answer brochure about the Qest polybutylene plumbing system, states: (1) there was no danger of freeze damage, (2) the system could carry boiling water or steam for prolonged periods without debilitating damage to the system, (3) testing agencies projected a normal life of 50 years for the system, and (4) there was no corrosion and polybutylene was resistant to most acids and bases. Plaintiffs' exhibit 118, also a question-and-answer brochure from Qest, contains substantially the same information as PX 117. Plaintiffs' exhibits 120 and 121 are a Qest polybutylene plumbing systems catalog, dated June 1, 1979. They characterize Qest crimp tools as better and more reliable than other tool systems; they state Celcon provides no-leak construction and is inert to chemicals, eliminating corrosion. Plaintiffs' exhibit 122 is a Qest polybutylene plumbing systems catalog, dated August 1, 1981. It warrants that Qest systems will not corrode or leak for 25 years when installed in accordance with the specifications. The warranty is limited to "potable water systems." It repeats the information of the earlier brochures that the tools are reliable and Celcon is corrosion-resistant.

Runyon has worked for U.S. Brass since 1981 as manager of product development engineering for its polybutylene product line. In January 1983, he assumed Watson's responsibility for failure analysis. He testified by deposition that U.S. Brass had made joint presentations at code approval hearings. The time and place of the hearings and the identity of the code bodies was not specified. He said that U.S. Brass provided a limited 25–year warranty on its polybutylene plumbing system, and that the warranty was made to unspecified builders, customers, and manufacturers' representatives.

Irwin is a plumbing contractor. During 1981–1985, his company installed polybutylene plumbing systems in new tract housing, among other places, although he did not know if he had installed the plumbing in any of the plaintiffs' houses. He testified that he participated in meetings before the Plumbing Review Board for the city of Houston in 1981 and 1982. The board approved plumbing products for use in the city of Houston. In particular, he remembered a meeting in 1982 where Shell stated that the polybutylene plumbing system was suitable for use in residential plumbing systems in Houston. He did not identify U.S. Brass as an attendee at the meetings or state that U.S. Brass made representations. He did not recall if any representatives from U.S. Brass came to his company to show his employees how to install the polybutylene plumbing system.

Clements was a former employee of a mechanical contractor that installed air conditioning, heating, and plumbing systems for homebuilder, Fox & Jacobs. In the early 1980's, the contractor was investigating polybutylene plumbing systems to determine if it was a better and more inexpensive system than ones currently in use. Clements testified representatives of U.S. Brass told him or showed him literature, including PX 117, 120, 121, and 122 stating, in essence, that a polybutylene system was better than copper and simpler to install, would not be affected or damaged by chemicals, and could exist in a family home for 50 years without problems. He said his employer relied on the representations of U.S. Brass in deciding to use the product. From the testimony of Tammie Love and Annie Farris it can be inferred that Frymire was the original plumbing contractor on the Love and Farris homes, built by Fox & Jacobs.

The following homebuilders built the appellants' homes: Monarch,[9] Fox & Jacobs,[10] Wood Brothers,[11] Weekley,[12] Great American,[13] NPC,[14] Genex,[15] and Champion.[16] We

---

9. Barrett, Bennett, Pauline Borski, Dingle, Ditges, Jeffrey Schultz, Sykora and Terdin, and Turner.

10. Farris, John Langman, Love, and Reaux.

11. Bengston, Jackson, Jacobs, and Stanfill.

12. Cantu, Dan Patterson, Thumann, and Yeates.

13. Casias, Christensen, and Fish.

14. Gudrun Colon–Pomales and Sisk.

15. Pop.

16. Riley.

found no evidence in the record concerning what influenced NPC, Genex, or Champion to use polybutylene plumbing systems in the homes they built. While there is no evidence concerning what influenced Great American to use a polybutylene plumbing system, Manis, a representative of U.S. Brass, testified that he met with Great American.

Spears, a former Monarch employee, testified by deposition that he did not recall receiving any representations from U.S. Brass concerning the polybutylene plumbing system. He remembered attending a promotional presentation at Shell and talking to Chantos, a manufacturer's representative for Vanguard. Vanguard was a competitor of U.S. Brass and also made polybutylene pipe and Celcon fittings. He said he relied on Chantos and Shell. Spears remembered it being indicated to him that a polybutylene plumbing system was suitable for application in Monarch homes and that it was corrosion resistant. Treece, also a former Monarch employee, testified by deposition that Monarch relied on Shell's representations in deciding to use the polybutylene plumbing system. He did not remember speaking to U.S. Brass until 1987, and that concerned problems with the system.

Davis, a former Wood Brothers employee, testified by deposition that he first learned of polybutylene plumbing systems at a home building convention in 1982. He did not recall with whom he spoke, but he did not remember dealing with anyone from U.S. Brass or Qest. He stated that representations from manufacturers or suppliers of the polybutylene plumbing system were the primary reason why Wood Brothers adopted the polybutylene, but he did not recall who the manufacturers or suppliers were. He said that polybutylene was represented as being able to expand in the event of a freeze, resistant to mineral buildup, long lived, and a quality product.

Cooper, also a former Wood Brothers employee, said the decision to use the polybutylene plumbing system rested with Davis, and that Davis based his decision on presentations made by Shell and Vanguard together. He did not recall any contact with representatives of U.S. Brass.

Ashford, formerly of Wood Brothers, remembered having contact with Shell and Vanguard representatives. He had seen Vanguard sales brochures and stated the decision to buy the polybutylene plumbing system was based partly on such literature. He did not recall having any contact with U.S. Brass.

David Weekley, the owner of Weekley Homes, Inc., testified that he was introduced to polybutylene plumbing systems at trade shows starting in 1982. It was first placed in homes he built in 1984. While he was not completely sure, he believed the display at the trade show on polybutylene plumbing systems was sponsored by Shell. He found out the plumbing system was approved by all of the code bodies and, because code bodies are usually very strict in their approval process, that gave him comfort. Additionally, the plumbing system was manufactured by large companies, and seemed to be a reasonable alternative to copper and galvanized pipe that could freeze.

Weekley testified that Shell told him the product was suitable for his use, desirable for residential use in Houston, and was good. He also stated that his director of operations did research on polybutylene plumbing systems, and spoke with Chantos (Vanguard's representative). Weekley decided to use polybutylene plumbing systems based on the information from the trade show and his operations director's research. Weekley also testified that his sales and marketing personnel passed on the representations of the promoters of polybutylene plumbing systems to homebuyers, both verbally and through displays at sales offices.

There is no evidence that any of the appellants heard any of U.S. Brass' representations, or saw any of its brochures or literature. With the exception of Fox & Jacobs and Great American, there is no evidence that any of the appellants' homebuilders heard any of U.S. Brass' representations, or saw any of its brochures or literature. In his closing arguments, the appellants' counsel summarized their DTPA cause of action as follows:

The plaintiffs in this case have testified that they relied upon companies like Celanese, Shell, Brass.... The way they relied upon them was they bought a home with their plumbing systems. They didn't know about those companies or their roles in it or their internal memorandums. They had no idea of that. They received because of the chain of distribution a plumbing system that they found out years later would not work and after they did that, after they found out about the false, misleading and deceptive acts and practices of this group of companies from someone in the form of [another counsel for plaintiffs], they immediately brought this lawsuit that we're here on today.

In 10 points of error, the appellants assert the trial court erred in disregarding generally the jury's answers to questions one through six, in disregarding such answers because the evidence established they were consumers under the DTPA as to U.S. Brass, in disregarding such answers because the evidence was legally sufficient to support the findings, and in failing to automatically treble their actual damages because the 1977 version of the DTPA applied. In the final, eleventh point, the appellants contend the trial court erred in granting U.S. Brass' motion for judgment on the verdict regarding four of the appellants because the evidence conclusively proved as a matter of law that U.S. Brass violated the DTPA.

In two cross-points, U.S. Brass challenges the judgment in favor of some of the 23 appellants on their negligence cause of action. In six cross-points, U.S. Brass affirmatively defends the trial court's judgment notwithstanding the verdict in its favor on the appellants' DTPA cause of action and further asserts the evidence was factually insufficient to support several of the jury's findings. Tex.R.Civ.P. 324(c).

**Judgment Notwithstanding the Verdict**

■■■ A judgment notwithstanding the verdict is proper only when a directed verdict would have been proper. *Eubanks v. Winn,* 420 S.W.2d 698, 701 (Tex.1967); *Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147, 154 (Tex.App.—Houston [1st Dist.] 1991,

writ denied); Tex.R.Civ.P. 301. A directed verdict is proper when special issue findings are immaterial or have no support in the evidence. *Eubanks,* 420 S.W.2d at 701; *Winograd,* 811 S.W.2d at 154.

In the first ground of its motion for judgment notwithstanding the verdict, U.S. Brass argued the court should disregard the jury's answers to question one because there was no evidence that it made any representations *to the plaintiffs* or made any representation *as part of a transaction to which plaintiffs were consumers.* This argument is tantamount to asserting that the jury's affirmative findings on DTPA violations, causation, and damages were immaterial because the plaintiffs did not meet the "consumer-status test" necessary for a recovery under the DTPA, which U.S. Brass claims the Texas Supreme Court has enunciated. In their motion for entry of judgment, the plaintiffs argued there is no such "consumer-status test."

■■■ In its next grounds for seeking judgment notwithstanding the verdict, U.S. Brass contended there was no evidence that it engaged in false, misleading, or deceptive acts or practices, or that it engaged in an unconscionable action or course of action. In reviewing whether the trial court erred in granting the motion for judgment notwithstanding the verdict based on "no evidence" grounds, we must determine whether there is any evidence upon which the jury could have made its findings. *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex. 1986). We review the record in the light most favorable to the finding, considering only the evidence and inferences that support the finding and disregarding the evidence and inferences contrary to the finding. *Id.* If there is more than a scintilla of competent evidence to support the jury's finding, then the judgment notwithstanding the verdict will be reversed. *Id.*

In its final grounds, U.S. Brass asserted that the jury's answers to questions two, three, four, five, 5A, and six were immaterial because it had not violated the DTPA.

The trial court granted U.S. Brass' motion for JNOV either on the basis of the "consumer-status test" argument or because it found

there was no evidence to support the jury's findings of deceptive or unconscionable acts, respectively, in response to questions one and 1A.

### Elements of a DTPA Cause of Action

■ To recover under the DTPA, a plaintiff must establish that he is a "consumer," that there were false, misleading, or deceptive acts or an unconscionable act, and that the act or acts constituted a producing cause of damage. *Custom Controls Co. v. MDS Qantel, Inc.,* 746 S.W.2d 261, 263 (Tex.App.—Houston [1st Dist.] 1987), *rev'd, Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302 (Tex.1988); *Miller v. Soliz,* 648 S.W.2d 734, 739 (Tex.App.—Corpus Christi 1983, no writ); *Bormaster v. Henderson,* 624 S.W.2d 655, 660 (Tex.App.—Houston [14th Dist.] 1981, no writ); Tex.Bus. & Com.Code Ann. § 17.50(a)(1), (3) (Vernon 1987). A "consumer" is "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services...." Tex.Bus. & Com.Code Ann. § 17.45(4) (Vernon 1987).

■■ A person who brings a private lawsuit under section 17.50 must be a consumer, as defined in section 17.45(4). *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 351 (Tex.1987); *Sherman Simon Enter., Inc. v. Lorac Serv. Corp.,* 724 S.W.2d 13, 15 (Tex. 1987); *Flenniken v. Longview Bank & Trust Co,* 661 S.W.2d 705, 706 (Tex.1983); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 538 (Tex.1981); *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980); *see also Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 388 (Tex.1982). The Texas Supreme Court has also stated:

> We have recognized at least two requirements to establish DTPA consumer status. First, the plaintiffs must have sought or acquired goods or services by purchase or lease. Second, the goods or services purchased or leased must form the basis of the complaint.

*Melody Home Mfg. Co.,* 741 S.W.2d at 351–52 (citations omitted) (citing *Sherman Simon Enter., Inc.,* 724 S.W.2d at 15 and *Cameron,* 618 S.W.2d at 539). Neither section 17.50 nor section 17.45 limits the application of the DTPA to deceptive practices committed by persons who furnish the goods or services on which the complaint is based or describes against whom a consumer may bring suit. *Cameron,* 618 S.W.2d at 540–41.

■ In their second point of error, the appellants argue all that is required to be a consumer under the DTPA is that: (1) they have sought or acquired goods or services for purchase or lease, and (2) those goods or services must form the basis of their complaint. *See Sherman Simon Enter.,* 724 S.W.2d at 15; Tex.Bus. & Com.Code Ann. §§ 17.45(4), 17.50(a). They point out it is undisputed that they acquired the polybutylene plumbing system designed, manufactured, marketed, and sold by U.S. Brass when they purchased their homes, and that the polybutylene plumbing system forms the basis for their complaint.

The appellants also rely on the following language in *Birchfield v. Texarkana Memorial Hospital,* 747 S.W.2d 361 (Tex.1987):

> Equally unpersuasive is [the hospital's] contention that [the infant] Kellie Birchfield was not a consumer within the meaning of the D.T.P.A. A plaintiff establishes her standing as a consumer in terms of her relationship to a transaction, not by a contractual relationship with the defendant.

*Id.* at 368 (citing *Flenniken,* 661 S.W.2d at 707).

U.S. Brass does not contest the consumer status, in general, of the appellants. However, it responds that the appellants *are not consumers as to U.S. Brass,* pointing to the language in *Cameron* and *Melody Home Mfg. Co.* that states a consumer is defined in section 17.45(4) only in terms of a person's relationship to a transaction in goods or services. Therefore, according to U.S. Brass, because the appellants have no relationship to any transaction with U.S. Brass, they are not consumers with respect to U.S. Brass. U.S. Brass cites in support of its position *Taylor v. Burk,* 722 S.W.2d 226 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.), where the Amarillo Court of Appeals stated:

> In this instance, there is no evidence in the record to show that B.O. Burk was *con-*

nected *with* the real estate transaction between Taylor and the Millers. It is undisputed, conclusively established, and admitted to by Taylor that B.O. Burk made no representations to him about the house. In fact, Taylor admitted that he never talked to B.O. Burk about the house when Taylor purchased it from the Millers.

*Id.* at 228–29 (emphasis original). The court concluded that the trial court did not err in granting Burk's motion for judgment notwithstanding the jury's verdict that he had violated the DTPA and damaged Taylor. The Amarillo Court of Appeals did not hold that Taylor was not a "consumer," but it did quote from *Cameron* in reaching its result. *Id.* at 228.

We disagree with U.S. Brass. We do not believe the Texas Supreme Court has grafted onto the definition of a consumer under the DTPA a requirement that, in order to be a "consumer," representations must be made directly by the defendant to the plaintiff or that the representations must be made in connection with a transaction between the plaintiff and the defendant. This becomes clear from a careful reading of *Flenniken* and *Cameron.*

In *Flenniken,* the Flennikens entered into a contract to have a home built, giving the contractor cash down and signing a mechanics' lien note. 661 S.W.2d at 706. The note was secured by a deed of trust on the Flennikens' property, which named the bank vice-president as trustee. The contractor assigned the note and contract lien to the bank in exchange for interim financing. The bank made payments to the contractor totaling more than half the note, but the contractor abandoned the project after completing only 20 percent of it.[17] When the Flennikens and the bank failed to agree on what to do with the unfinished house, the bank foreclosed on their property. The Flennikens sued the bank under the DTPA for unconscionable action. *Id.* The bank did not challenge the

jury's finding of unconscionability, but argued the Flennikens were not consumers because they did not seek or acquire any goods or services from the bank. *Id.* The supreme court found there was only one transaction—the purchase of a house, and that the Flennikens were consumers to all parties who sought to enjoy the benefits of that transaction, including the bank. *Id.* at 707. The supreme court stated in *Flenniken:*

> Under section 17.50(a)(3), there is *no requirement that the defendant's unconscionable act occur simultaneously with the sale or lease of the goods or services* that form the basis of the consumer's complaint.

661 S.W.2d at 707 (emphasis added).

In *Cameron,* Terrell & Garrett was the real estate agent for the sellers of the home purchased by the Camerons. 618 S.W.2d at 537. Terrell & Garrett made a representation in the MLS guide about the amount of square footage in the house; the Camerons discovered after moving in that the amount was wrong; and the Camerons sued Terrell & Garrett. The trial court rendered a judgment notwithstanding the verdict for Terrell & Garrett; the court of appeals affirmed, holding that the Camerons were not consumers, but otherwise finding there was evidence to support the jury verdict. *Id.* at 538. The only issue before the supreme court was whether the Camerons were consumers. *Id.*

The supreme court recognized in *Cameron* "at least two requirements" for a person to qualify as a consumer under the DTPA: (1) a person must have sought or acquired goods or services by purchase or lease; and (2) the goods or services purchased or leased must form the basis of the complaint. *Id.* at 539. The court overruled several courts of appeals' opinions, including one from this Court,[18] which had held that a consumer is one who seeks or acquires goods or services

---

17. The bank made the disbursements to the contractor solely upon his application, never made on-site inspections, and never asked the Flennikens to approve the draws. *Longview Bank & Trust Co. v. Flenniken,* 642 S.W.2d 568, 569 (Tex.App.—Tyler 1982), *rev'd, Flenniken v. Long-* view Bank & Trust Co., 661 S.W.2d 705 (Tex. 1983).

18. *Barthlow v. Metcalf,* 594 S.W.2d 143 (Tex.Civ. App.—Houston [1st Dist.] 1979, writ dism'd).

*furnished by the defendant. Id.* The court said:

> Consumer is defined in section 17.45(4) only in terms of a person's relationship to a transaction in goods or services. It does not purport to define a consumer in terms of a person's relationship to the party he is suing. Section 17.45(4) does nothing more than describe the class of persons who can bring a suit for treble damages under section 17.50. It does not say who a consumer can sue under section 17.50 for a deceptive trade practice violation. With respect to whom a consumer can sue, section 17.-50(a)(1), the subsection under which this suit was tried, expressly states that a consumer can bring a suit if he has been adversely affected by "the use or employment by *any person* of an act or practice declared to be unlawful in section 17.46." Terrell & Garrett is a person under the Act. We, therefore, hold that a person need not seek or acquire goods or services furnished by the defendant to be a consumer as defined in the DTPA.

618 S.W.2d at 541 (citations omitted) (emphasis original).

We have quoted at length from *Cameron* for the purpose of showing that the supreme court was concerned with explaining that the absence of a relationship between the plaintiff and the defendant in a DTPA case did not deprive the plaintiff of consumer status. We do not read *Cameron* as establishing that to be a consumer, in addition to the requirements in section 17.45(4), a plaintiff must have a relationship to a transaction with the defendant. If anything, the supreme court has plainly indicated in *Flenniken* and *Cameron* that it will not narrow the definition of "consumer" under section 17.45(4) of the DTPA. *See also Kennedy v. Sale,* 689 S.W.2d 890, 892 (Tex.1985) (to accept the construction that only direct purchasers can be consumers, would be to read additional or different language into the DTPA, in contravention of its mandate of liberal construction).

We find additional support for our conclusion that the appellants are consumers to U.S. Brass by analogy to *Knight v. International Harvester Credit Corp.,* and *Holland Mortgage & Investment Corp. v. Bone,* 751 S.W.2d 515 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). *Knight* and *Bone* discuss when the extension of credit, which alone is ordinarily not a good or service subject to the provisions of the DTPA, may subject the creditor to a transaction to liability under the DTPA.

In *Knight,* the plaintiff entered into a retail installment contract to purchase a used International Harvester dump truck from a company called Etex. 627 S.W.2d at 383. The transaction was financed by International Harvester Credit (IHCC). *Id.* at 389. In fact, the contract was drafted by IHCC, bore its logo, and contained a clause assigning the contract to IHCC. *Id.* The supreme court had no difficulty in finding the plaintiff was a " 'consumer' as to IHCC," finding the seller of the truck, Etex, and IHCC "so inextricably intertwined in the transaction as to be equally responsible for the conduct of the sale." *Id.* Similarly, in *Bone,* the plaintiffs established some evidence of a "tie-in" relationship between the builder of their home and the lender of the funds to build it. 751 S.W.2d at 518. The builder recommended the lender and arranged for an appointment between the plaintiffs and the lender, and the contract between the builder and the plaintiffs provided for inspections by the lender and completion of the builder's obligations after the lender's final inspection. *Id.* This Court concluded that because there was some evidence of a tie-in relationship between the builder and lender, the trial court did not err in deciding that the plaintiffs were consumers to all parties, the builder and lender, who sought to enjoy the benefits of the sale. *Id.*

■ A "tie-in" or "inextricable intertwining" between a *seller and lender* may cause a plaintiff to be a consumer with respect to the financing company as well as to the seller of the goods. *See Qantel Business Sys.,* 761 S.W.2d at 305. In *Qantel,* the issue was whether the manufacturer (Qantel) of the computer system could be liable for the deceptive practices of its distributor, who settled before trial. The supreme court stated "inextricably intertwined" was not an additional theory of vicarious liability, but might

be used to establish equal responsibility for wrongful conduct. We read *Qantel* as suggesting that if two parties are inextricably linked, in ways other than seller and lender, a plaintiff may be a consumer with respect to both of them.

■ The appellants here did not buy windows, a roof, or a plumbing system. They bought a completed home, ready for move-in. The evidence generally established that the homebuilders contracted with others to furnish and install plumbing systems in the homes; the installers obtained plumbing supplies from the supply houses; manufacturers, like U.S. Brass and Vanguard, sold their plumbing products to the supply houses and advertised the merits of their products to homebuilders, plumbing contractors, and municipal code bodies. There is the same "inextricable intertwining" here that the supreme court and this Court found sufficient to make buyers "consumers" with respect to both the seller and financier of the transactions in *Knight* and *Bone.*

We sustain the appellants' second point of error. Therefore, if the trial court granted U.S. Brass' motion for judgment notwithstanding the verdict based on its "consumer-status test" argument, the trial court erred.

However, for a plaintiff to be a "consumer" is no guarantee of recovery under the DTPA. The plaintiff must still establish a deceptive or unconscionable act, which is a producing cause, of actual damages. *See, e.g., Qantel Business Sys., Inc.*, 761 S.W.2d at 305 (reaffirming *Guerra* ); *Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134, 136 (Tex.1987) (consumer must show that defendant has committed a deceptive act that is the producing cause of the consumer's damages); *Sherman Simon Enter.*, 724 S.W.2d at 14 (despite plaintiff's consumer status, it failed to recover because defendant had made no misrepresentation); *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex. 1985) (disapproving of dicta in court of appeals decision that DTPA requires proof of "reliance" for recovery; relief for consumers is specified in section 17.50 and the operative words are "producing cause"). We note that in *Taylor v. Burk*, the Amarillo Court of Appeals never expressly held that Taylor was not a consumer. The *Taylor* decision is also consistent with the plaintiff, Taylor, failing to establish that Burk (who sold the house to the Millers) made any misrepresentation to him, or that the Millers, from whom Taylor purchased the house, provided any specific information that they had received from Burk. *See id.* at 227, 228–29. Therefore, we proceed to review the legal sufficiency of the evidence to support the jury's findings.

### Legal Sufficiency of the Evidence

Typically, in a DTPA cause of action, the plaintiff sues the party who used a false, misleading, or deceptive act against it, breached an express or implied warranty to it, or committed an unconscionable action against it. *See, e.g., Birchfield*, 747 S.W.2d at 368 (parents' DTPA cause of action grounded in defendant hospital's failure to disclose inadequacies in nursery to them); *Melody Home Mfg. Co.*, 741 S.W.2d at 351 (buyers sued company who manufactured and sold to them their mobile home for breach of implied warranty to them); *Sherman Simon Enter.*, 724 S.W.2d at 14 (plaintiff company sued car rental agency for misrepresentation in agreement signed by plaintiff's employee/agent); *Chastain v. Koonce*, 700 S.W.2d 579, 580 (Tex.1985) (buyers of land sued sellers of land claiming sellers had made misrepresentations and committed an unconscionable action in connection with the transaction); *Kennedy*, 689 S.W.2d at 891 (insured under a group policy sued insurance agent for misrepresenting preexisting condition coverage to him, although no misrepresentation made to employer); *Flenniken*, 661 S.W.2d at 706 (property owners sued bank for its unconscionable conduct to them after the contractor who partially built the house and arranged the financing left the scene); *Cameron*, 618 S.W.2d at 537 (buyer of real estate sued broker for misrepresentation made in MLS guide that buyer read). It is undisputed in this case that the appellants did not see or hear or read any representations from U.S. Brass, and in fact, had no contact with U.S. Brass before or during the purchase of their homes.

■ For three reasons, we do not believe the absence of knowledge of the representa-

tions and of contact with the party making them at the time they purchased their homes automatically ends the appellants' right to recovery under the DTPA. First, in *Flenniken*, 661 S.W.2d at 707, the supreme court noted that section 17.50(a) contains no requirement that the defendant's act occur simultaneously with the sale or lease of the goods or services that form the basis of the consumer's complaint.

Second, under *Weitzel*, 691 S.W.2d at 600, the supreme court disapproved of dicta in the court of appeals decision, which read into the DTPA a requirement of proof of reliance on the misrepresentation before a consumer could recover. The court said that the plaintiffs' pleading, that the equipment and systems in the home were represented by the defendants as being in accordance with the city's code when in truth such misrepresentations were false, misleading, and deceptive, was sufficient. *Id.* According to the court, the operative words under section 17.50(a) were "producing cause." *Id.* We understand the dicta in *Weitzel* to mean the proper inquiry is not the reliance of the consumer, but whether the representations were a producing cause of damage.

Third, in *Guerra*, 733 S.W.2d at 136, the supreme court stated a consumer, under the DTPA, need not establish contractual privity with the defendant, but must show that the defendant has committed a deceptive act that is the producing cause of the consumer's damages. The supreme court also said that the DTPA does not attach derivative liability to a defendant based on innocent involvement in a business transaction. Both statements have been reiterated by the court in *Qantel Business Sys.*, 761 S.W.2d at 305.

In accordance with the dictates of *Weitzel* and *Guerra*, we focus on the issue of producing cause.

 In their third point of error, the appellants contend the trial court erred in disregarding the jury's affirmative answer to question one and in granting a judgment notwithstanding the verdict because the evidence was legally sufficient to support the answer that U.S. Brass' false, misleading, or deceptive acts were a producing cause of their damages.

In separate charges for each plaintiff, jury question one asked the following, and the jury responded affirmatively for each of the 23 appellants:

QUESTION NO. 1

Did any of the parties listed below engage in any false, misleading or deceptive act(s) or practice(s) that were a producing cause of damages, if any, to [plaintiffs' names]?

| | | YES | NO |
|---|---|---|---|
| (c) | U.S. Brass | X | |

---

The testimony of Manis and Clements and plaintiffs' exhibits 117, 118, 120, 121, and 122 are some evidence that U.S. Brass made representations to the homebuilders Great American and Fox & Jacobs, about the longevity and lack of susceptibility to corrosion of its polybutylene plumbing system.[19] The testimony of Chudnovsky, Stivala, and Thames is some evidence that such representations were false. There is no evidence whether homebuilders NPC, Genex, or Champion received representations from U.S. Brass.[20] Representatives of homebuilders Monarch, Wood Brothers, and Weekley[21] testified that they had no recollection of any promotional literature or representations

---

19. The Farris, Langman, Love, and Reaux homes were built by Fox & Jacobs. The Casias, Christensen, and Fish homes were built by Great American.

20. NPC built the Colon–Pomales and Sisk homes. Genex built the Pop home. Champion built the mobile home of the Rileys.

21. Monarch built the Barrett, Bennett, Borski, Dingle, Ditges, Schultz, Terdin, and Turner homes. Wood Brothers built the Bengston, Jackson, Jacobs, and Stanfill homes. Weekley built the Cantu, Patterson, Thumann, and Yeates homes.

from U.S. Brass; they recalled the promotional literature and representations of Vanguard and Shell. Either the appellants were not asked any questions about what representations U.S. Brass made to them or what brochures they had seen, or they testified they had not heard or seen any representations from U.S. Brass.

A producing cause is an "efficient, exciting, or contributing cause, which in a natural sequence, produces the injuries or damages complained of." *Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 496 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Danny Darby Real Estate, Inc. v. Jacobs,* 760 S.W.2d 711, 716 (Tex.App.—Dallas 1988, writ denied); *MacDonald v. Texaco, Inc.,* 713 S.W.2d 203, 205 (Tex.App.—Corpus Christi 1986, no writ). Producing cause has also been described as factual causation. *Jacobs,* 760 S.W.2d at 716; *Hycel, Inc. v. Wittstruck,* 690 S.W.2d 914, 922 (Tex.App.—Waco 1985, writ dism'd).

There is no evidence that the representations of U.S. Brass caused its fittings and pipe to be used in the appellants' homes built by Monarch, Wood Brothers, Weekley, NPC, Genex, or Champion. Therefore, there is no evidence that any misrepresentations of U.S. Brass were a producing cause of those appellants' damages. However, there is some evidence that U.S. Brass' representations caused its plumbing products to be used in homes built by Great American and Fox & Jacobs. Accordingly, there is some evidence that its representations were a producing cause of damages to the Casiases, the Christensens, the Farrises, the Fishes, John Langman, the Loves, and the Reauxes.

We sustain the appellants' third point of error as it relates to the Casiases, the Christensens, the Farrises, the Fishes, John Langman, the Loves, and the Reauxes, and overrule it as it relates to the remainder of the 23 appellants.

■ In their fourth point of error, the appellants assert the trial court erred in disregarding the jury's answer to question 1A and granting a judgment notwithstanding the verdict because the evidence was legally sufficient to support the answer that U.S. Brass engaged in an unconscionable act or course of action that was a producing cause of their damages.

In separate charges for each plaintiff, jury question 1A asked the following, and the jury responded affirmatively for each of the 23 appellants:

### QUESTION NO. 1A

Did any of the parties listed below engage in any unconscionable action or course of action that a producing cause of damages, if any, to [plaintiffs' names]?

| | | YES | NO |
|---|---|---|---|
| (c) | U.S. Brass | X | |

---

■ The DTPA defines an "unconscionable action or course of action" as an act or practice which, to a person's detriment: (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or (B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration. *Brown v. Galleria Area Ford, Inc.,* 752 S.W.2d 114, 116 (Tex.1988); *Chastain,* 700 S.W.2d at 582; TEX.BUS. & COM.CODE ANN. § 17.45(5)(A), (B) (Vernon 1987). The supreme court has emphasized that the unconscionable action must take advantage of the consumer to a *grossly* unfair degree, and said that the term "gross" should be given its ordinary meaning of glaringly noticeable, flagrant, complete, and unmitigated. *Chastain,* 700 S.W.2d at 583. It is not enough that the defendants took *un-*

*fair* advantage of the purchasers, but the advantage must be *grossly unfair.* *Id.* at 582. Like "a false, misleading, or deceptive act or practice," to be actionable, the alleged unconscionable act must be a producing cause of damage. *Miller,* 648 S.W.2d at 739; TEX.BUS. & COM.CODE ANN. § 17.50(a)(3).

According to the appellants, the charge to the jury was based on section 17.45(5)(A). The appellants point to the deposition testimony of Gottfried, an employee of Celanese, and Tripp, a former employee of U.S. Brass, to prove the unconscionable action or course of action of U.S. Brass.

Gottfried testified that Celanese had always recommended to its customers that they make a prototype part and check it under the severest conditions expected in end use to ensure against premature failure. He said that Celanese had recommended Celcon to U.S. Brass for application in the plumbing system, provided Celanese's recommendations having to do with design and molding techniques were followed. According to Gottfried, his major recommendation to U.S. Brass, found in a report of June 1982, was always to round the sharp internal corners to prevent the possibility of breakage in those corners. Gottfried testified it was his impression that U.S. Brass was not responsive to Celanese's recommendations concerning molding techniques.

Tripp was a product development specialist for U.S. Brass in a seven-state area on the west coast from December 1980 to April 1983. Texas was not in his area. Among other things, he inspected the work plumbers were doing in the field. He testified that as time went on he was continually seeing problems. He said the main types of failures were: (1) the pipe pulling off of the fitting with the ring intact, (2) the ring snapping or fracturing, and (3) the actual barb coming out of the fitting. He felt the failure of the fittings was excessive, and felt there was a discrepancy between what the company taught him about the product and what he was seeing in the field. At one point, Tripp sent a report dated January 18, 1982, to his supervisors summarizing what he was seeing and questioning the system. He testified he got a telephone call from someone who worked under his supervisor telling him to destroy the last couple pages of the report.

Tripp also stated that in one instance, in Visalia, California, he found bags of "T" fittings that had been sent from the factory with one side of the "T" fitting being too small. U.S. Brass made arrangements to take the bags back and replace them with good parts. Tripp testified that he saw a lot of "sloppy" plumbing jobs, and it was obvious what was causing the problem. He also saw good plumbing jobs, yet there were still leaks.

From the testimony of Gottfried and Tripp, U.S. Brass' alleged unconscionable action or course of action consisted of being nonresponsive to Celanese's recommendation to round the sharp internal corners of fittings, sending defective fittings to Visalia, California, and attempting to destroy the last page of Tripp's report, which stated that enormous problems still needed to be overcome and recommended a serious research and development program to perfect U.S. Brass' fittings, tools, and rings. There is no evidence that "sharp internal corners" or defective fittings sent to Visalia were a producing cause of the leaks in the appellants' plumbing system.

Tripp's report summarized a meeting he had in California on January 13, 1982, with Lange Plumbing Supply, a supply house, Budget Homes, a builder, and Ward Plumbing, a plumbing contractor for Budget. There were two agenda items: two recent plumbing failures in Budget homes and reimbursement to Lange for defective plumbing parts.

Budget and Ward brought in eight fittings that had recently failed. The fittings were from either two homes or three homes. Budget's concern was not reimbursement from U.S. Brass, but identification of the problem and how to correct it to avoid future failures. Ward had installed Qest plumbing systems in approximately 140 homes, and the problems were limited to 10 or 15 of those homes, mostly in one tract. Tripp took some measurements of the broken fittings, and from a visual inspection concluded there might be four factors influencing the failures.

One of those, ribs on the barb not deep enough, had already been addressed by U.S. Brass deepening the ribs. Two of those related to the tool not being properly adjusted, either as a result of plumber error or a problem in tool design or instructions. Some of the failures involved unannealed rings, which recently U.S. Brass had stopped using in favor of annealed rings.

The report does not discuss the status of the defective plumbing parts returned by Lange some 10 months previously, but it does discuss Lange's stock of some 15,000 fittings and annealed rings, which Lange had purchased two years before. Tripp recommended U.S. Brass accept these back in exchange for new material. The record does not show what action U.S. Brass took in response to Tripp's recommendation.

Taken as a whole, Tripp's report of events in California provides no evidence that such events were a producing cause of damage to the appellants, or that U.S. Brass took advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree, thereby committing an unconscionable action.

We overrule the appellants' fourth point of error.

We have found the appellants are consumers and, therefore, sustained their second point of error. Because we have concluded there was no evidence that any unconscionable act of U.S. Brass was a producing cause of damage to the appellants and, therefore, overruled their fourth point of error; and because we have concluded there was no evidence that any false, misleading, or deceptive act of U.S. Brass was a producing cause of damage to 16 of the appellants and, therefore, sustained their third point of error for only seven of the appellants, we hold the trial court properly granted a judgment notwithstanding the verdict against 16 of the appellants: the Barretts, the Bengstons, the Bennetts, Pauline Borski, the Cantus, the Dingles, the Ditgeses, the Jacksons, the Jacobses, the Pops, the Rileys, Jeffrey Schultz, the Sisks, the Stanfills, Terdin and Sykora, and the Turners. The trial court erred in grant-

ing a judgment notwithstanding the verdict against seven of the appellants, the Casiases, the Christensens, the Farrises, the Fishes, John Langman, the Loves, and the Reauxes on their DTPA cause of action.

◼ The appellants' first point of error summarizes the jury's answers to questions one through six, sets forth the standard of review for a JNOV, and concludes without record references or argument that the evidence was substantial to support the jury's findings. We do not consider it. TEX. R.APP.P. 74(d), (f). In any event, its substance is addressed in our previous discussion of points of error two, three, and four and our discussion below of the cross-points of U.S. Brass.

We also do not consider the appellants' points of error five, seven, eight, nine, and 10 because the trial court did not grant the judgment notwithstanding the verdict based on no evidence to support the jury's responses to questions two, three, four, five, and six. Where appropriate in response to U.S. Brass' cross-points, we will consider the appellants' points of error as reply points.

### Mandatory Treble Damages

◼ In their sixth point of error, the appellants contend the trial court erred in failing to automatically treble the appellants' actual damages under the DTPA because the 1977 version of the DTPA applied as a matter of law. We consider this point of error because we have found it was error to grant a judgment notwithstanding the verdict against seven of the appellants.

In 1977, section 17.50(b) read in part as follows:

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) *three times the amount of actual damages* plus court costs and attorneys' fees reasonable in relation to the amount of work expended. . . .

Act of May 21, 1973, 63rd Leg., R.S., ch. 143, § 1, 1973 Tex.Gen.Laws 322, 327 (emphasis added). This section was amended in 1979, effective August 27, 1979,[22] to read as follows:

---

22. Act of June 13, 1979, 66th Leg., R.S., ch. 603,

§ 4, 1979 Tex.Gen.Laws 1327, 1330. A subse-

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of actual damages found by the trier of fact. In addition the court shall award two times that portion of the actual damages that does not exceed $1000. If the *trier of fact finds that the conduct of the defendant was committed knowingly,* the trier of fact *may award not more than three times the amount of actual damages in excess of $1000....*

Tex.Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon Supp.1993) (emphasis added). The new wording applied prospectively only. It did not affect, procedurally or substantively, a cause of action that arose in whole or in part before August 27, 1979.[23] It is clear that before August 27, 1979, it was mandatory that a recovering plaintiff receive the award of treble damages. *Woods v. Littleton,* 554 S.W.2d 662, 671 (Tex.1977). For causes of action arising after that date, the trier of fact, in its discretion, could award additional damages not to exceed three times the amount of actual damages awarded in excess of $1,000, if it found the defendant's violations were committed knowingly. *Martin v. McKee Realtors, Inc.,* 663 S.W.2d 446, 447 (Tex.1984).

■ In their brief, the appellants assert, without reference to the record, that the representations and unconscionable acts or course of action by U.S. Brass concerning the polybutylene plumbing system began before August 27, 1979, the effective date of the 1979 amendments to the DTPA. They do not refer us to any evidence in the record in support of this assertion. Therefore, we need not consider their point of error. *Saldana v. Garcia,* 285 S.W.2d 197, 200–201 (Tex.1955).

Furthermore, our review of the record shows that the earliest date of a representation was PX 120, the Qest catalog dated June 1, 1979. There is no evidence that homebuilders or the Houston Plumbing Council saw this catalog before August 27, 1979. All of the appellants negotiated for and purchased their homes with the polybutylene

plumbing systems in the 1980's, and could not have had a cause of action against U.S. Brass, the manufacturer of the plumbing system about which they complain, before then.

We overrule the appellants' sixth point of error.

### The Colon–Pomales, Patterson, Thumanns, & Yeateses Appellants

In their eleventh point of error, the appellants assert the trial court erred in granting U.S. Brass' motion for judgment on the verdict with respect to Colon–Pomales, Patterson, the Thumanns, and the Yeateses because the evidence conclusively proved as a matter of law that U.S. Brass violated the DTPA.

■ The jury answered "no" to questions one and 1A, which asked if U.S. Brass engaged in any misrepresentations or unconscionable actions that were a producing cause of damage to Colon–Pomales, Patterson, the Thumanns, or the Yeateses. The appellants filed a motion for judgment notwithstanding the verdict on Colon–Pomales and the Thumanns. They filed no postjudgment motions on Patterson or the Yeateses, nor did they in any way object to judgment against Patterson or the Yeateses in accordance with the jury's verdict, nor did they object to U.S. Brass' motion for judgment on the verdict with respect to Colon–Pomales, Patterson, the Thumanns, or the Yeateses. Accordingly, error has not been preserved concerning Patterson and the Yeateses. Tex.R.App.P. 52(a), 74(d). We address the appellants' argument only as it concerns Colon–Pomales and the Thumanns.

■ When an appellant attacks the legal sufficiency of an adverse finding to an issue on which it had the burden of proof, we first examine the record for evidence supporting the jury finding, while ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). Second, if there is no evidence to support the fact finder's answer, then the entire record must

quent amendment to section 17.50(b)(1) in 1989 is not important to our discussion here.

23. Act of June 13, 1979, 66th Leg., R.S., ch. 603, § 9, 1979 Tex.Gen.Laws 1327, 1332.

be examined to see if the contrary proposition is established as a matter of law. *Id.; Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982).

 Plaintiffs' exhibit 220.13 showed that all of the fittings in the home of Colon–Pomales were made by Vanguard, not by U.S. Brass; however, all of the pipe in the home was made by U.S. Brass. Colon–Pomales testified that the fittings in her home were bad. She also agreed that some of the fittings were removed from her home and given to the plaintiffs' expert, Chudnovsky, to examine. Chudnovsky did not discuss the fittings of Colon–Pomales in particular, but he explained the failure of the fittings as a combination of chemical attack and mechanical stress on the fitting. We have found no evidence in the record, and the appellants do not refer us to any, that shows the leaks in the home of Colon–Pomales were caused by the pipe made by U.S. Brass. Therefore, any false, misleading, or deceptive acts or practices or unconscionable action by U.S. Brass could not have been a producing cause of damage to Colon–Pomales. The evidence in the record supports the jury's adverse finding on Colon–Pomales.

Plaintiffs' exhibit 220.38 showed that all of the fittings in the home of the Thumanns were made by Vanguard, not by U.S. Brass; half of the pipe in the home was made by U.S. Brass and half by Vanguard. Mr. Thumann testified their home had one leak, which occurred in the garage. There is no direct testimony about whether the leak occurred as a result of the fittings or pipe. However, Thumann said that he had a plumber come in after the leak to replace the fittings with copper ones, suggesting that the Vanguard fittings were the source of the leak. We have found no evidence in the record, and the appellants do not refer us to any, that shows the leaks in the home of the Thumanns were caused by the pipe made by

U.S. Brass. Therefore, any false, misleading, or deceptive acts or practices or unconscionable action by U.S. Brass could not have been a producing cause of damage. The evidence in the record supports the jury's adverse finding on the Thumanns.

We overrule the appellants' eleventh point of error.

### Cross–Points of U.S. Brass

In its first cross-point, U.S. Brass contends the trial court erred in denying its motion for judgment notwithstanding the verdict and to disregard the jury's answers to questions seven, 7A, eight, and nine with respect to the appellants' negligence cause of action because it was established as a matter of law that 11 appellants are barred from recovery based on the statute of limitations. U.S. Brass plead the affirmative defense of limitations, but a limitations issue relating to negligence was not submitted to the jury.

Because the jury found, in response to question seven, that the negligence of U.S. Brass was a proximate cause of damages to the plaintiffs, it was required to answer question eight. Question eight asked:

> Do you find that [plaintiffs' names] did not discover nor in the exercise of reasonable diligence, should have discovered, the negligent conduct of Defendants, if any you have found, before [date appropriate to particular plaintiffs]?

For each plaintiff, the jury answered, "Plaintiffs *did not* discover, nor should have discovered."

U.S. Brass argues that a negligence cause of action accrues when the wrongful act effects an injury, regardless of when the plaintiff learns of the injury, and that the discovery rule is inapplicable to this case. Therefore, according to U.S. Brass, the 11 appellants who had a first leak more than two years before they filed suit [24] were barred by

---

24. The **Cantus** bought their home in December 1984; they had their first leak in February 1986; they filed suit on December 22, 1988. The **Casiases** bought their home in April 1984; they had their first leak in September 1984; they filed suit on August 25, 1988. The **Farrises** bought their home in April 1982; they had their first leak in May 1982; they filed suit on December 22, 1988.

The **Fishes** bought their home in July 1982; they had their first leak in April 1986; they filed suit on October 31, 1988. The **Jacksons** bought their home in September 1983; they had their first leak in January 1986; they filed suit on December 22, 1988. The **Jacobses** bought their home in August 1983; they had their first leak in December 1983; they filed suit on May 23, 1988.

the statute of limitations from asserting their negligence claim.

■ A cause of action for negligence is governed by the two-year statute of limitations. *American Centennial Ins. Co. v. Canal Ins. Co.*, 810 S.W.2d 246, 255 (Tex.App.— Houston [1st Dist.] 1991), *aff'd in part and rev'd in part*, 843 S.W.2d 480 (Tex.1992);[25] TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(a) (Vernon 1986). Suit must be brought no later than two years from the date the cause of action accrued. *American Centennial Ins. Co.*, 810 S.W.2d at 255; TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(b) (Vernon 1986).

■ The general rule is that a cause of action sounding in tort accrues, in the absence of a statute to the contrary or fraudulent concealment, when the tort is committed, notwithstanding the fact that the damages, or their extent, are not ascertainable until a later date. *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex.1967). However, *Atkins* recognized that a legal injury had to be sustained before a cause of action arises. *Id.* The supreme court held that Atkins had not been injured prior to the deficiency assessment of the Internal Revenue Service, and found that in the absence of the assessment, injury may not have resulted. *Id. See also Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex.1977); *American Centennial Ins. Co.*, 810 S.W.2d at 255 (a cause of action accrues when facts come into existence that authorize one to seek a judicial remedy).

■ The alleged negligent acts of U.S. Brass occurred long before the 11 appellants purchased their homes. However, there was no injury to the appellants, and the tort was not complete, until the appellants suffered damage. In the case of the Loves, both of their leaks (February 1985 and March 1986) and the resulting damage occurred more than two years before they filed suit on December 22, 1988. Accordingly, we agree with U.S. Brass that the Loves' negligence cause of action was barred by the statute of limitations as a matter of law.

■ The remaining 10 appellants addressed by U.S. Brass in this point of error suffered damage with their first leak, and in all 10 instances that first leak and resulting damage occurred more than two years before they filed suit. But the fact that one leak and damage occurred more than two years before the lawsuit was filed does not mean, as a matter of law, that the statute of limitations bars suit based on damage from subsequent leaks occurring less than two years before suit was filed.

We note that, except in two instances, the second leak of the 10 appellants occurred a significant period of time after the first one (and, with two exceptions, within the statute of limitations): the Cantus, 16 months; the Casiases, 10 months; the Farrises, five years; the Fishes, one year; the Jacksons, 10 months; the Jacobses, six months;[26] the Reauxes, 10 months; the Rileys, two months;[27] Jeffrey Schultz, four years; and the Turners, three years. We find that the affirmative defense of limitations on the 10 appellants' negligence cause of action was not established as a matter of law.

We sustain U.S. Brass' first cross-point with respect to the Loves, and overrule it with respect to the other 10 appellants addressed by U.S. Brass.

In its second cross-point, U.S. Brass asserts the trial court erred in denying its motion for judgment notwithstanding the

The **Loves** bought their home in May 1983; they had their first leak in February 1985; their only other leak occurred in March 1986; they filed suit on December 22, 1988. The **Reauxes** bought their home in July 1983; they had their first leak in May 1986; they filed suit on December 22, 1988. The **Rileys** bought their home in June 1983; they had their first leak in February 1984; they filed suit on December 22, 1988. **Jeffrey Schultz** bought his home in September 1983; he had his first leak in April 1984; he filed suit on December 22, 1988. The **Turners** bought their home in February 1984; they had their first leak in June 1985; they filed suit on December 22, 1988.

25. The supreme court agreed that any claims for negligence were barred by the applicable statutes of limitations. 843 S.W.2d at 483.

26. The second and third leak of the Jacobses also occurred outside the statute of limitations.

27. The second, third, and fourth leak of the Rileys also occurred outside the statute of limitations.

verdict and to disregard the jury's answers to question nine (what sum of money would reasonably compensate the plaintiffs for the defendants' negligent conduct) because there is no evidence to prove the causation of damages to the appellants' homes or personal property. We interpret U.S. Brass' point to be a complaint that there is no evidence to support the jury's response to question seven that the negligence of U.S. Brass was a proximate cause of damages to the plaintiffs, but that of Vanguard was not.[28]

In reviewing "no evidence" points, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988).

U.S. Brass addresses this point of error to 19 of the 23 appellants. The 19 had a mixture of plumbing fittings in the plumbing systems in their homes.[29] In their eleventh amended original petition, the plaintiffs asserted that U.S. Brass, Vanguard, and the other manufacturers of the plumbing components were negligent in: (1) failing to adequately design the plumbing system; (2) failing to adequately manufacture the plumbing system or components; (3) failing to adequately inspect or test the plumbing system or components; (4) failing to give any or adequate instructions on installing the plumbing system or components; (5) failing to adequately design the tools and equipment used to install the plumbing system; (6) failing to give any or adequate warnings regarding the limitation of use of the plumbing system or components; and (7) representing that the plumbing system was suitable for site-built housing.

It was stipulated that before September 1, 1983, 100 percent of Vanguard's fittings were made of Celcon. After that date, 50 percent were made of Celcon and 50 percent of Delrin. Delrin, which was also an acetal, came from DuPont. Miller, a Vanguard employee, testified that Vanguard's product included pipe, the fitting, the ring tool, and the installation instructions. He stated that Vanguard knew from 1980 that chlorine could attack Celcon, but did not know that municipal water systems posed a threat until Celanese specifically warned of it in 1985. Miller believed that the overriding cause of fittings

---

28. Question seven asked if the negligence of Celanese, Shell, U.S. Brass, or Vanguard was the proximate cause of damages to the plaintiffs. The jury responded affirmatively to Celanese, Shell, and U.S. Brass, and negatively to Vanguard. Celanese, Shell, and Vanguard settled with the plaintiffs after the verdict.

29. The **Barretts** had fittings that were 54% Admiral Marine, 38% Vanguard, and 8% Qest, and pipe that was 100% Qest. The **Bengstons** had fittings that were 17% Admiral Marine, 53% Vanguard, and 30% Qest, and pipe that was 50% Qest and 50% Vanguard. The **Bennetts** had fittings that were 50% Vanguard and 50% Qest, and the pipe maker was not specified. **Pauline Borski** had fittings that were 15% Admiral Marine, 62% Vanguard, and 23% Qest, and pipe that was 100% Vanguard. The **Cantus** had fittings that were 50% Vanguard and 50% Qest, and the pipe maker was not specified. The **Dingles** had fittings that were 60% Vanguard and 40% Qest, and pipe that was 100% Vanguard. The **Ditgeses** had fittings that were 80% Vanguard and 20% Qest, and pipe that was 100% Vanguard. The **Farrises** had fittings that were 50% Vanguard and 50% Qest, and the pipe maker was not specified. The **Fishes** had fittings that were 90% White and 10% Qest, and pipe that

was 100% Qest. The **Jacksons** had fittings that were 50% Vanguard and 50% Qest, and pipe that was 100% Qest. **John Langman** had fittings that were 33% Admiral Marine, 22% Vanguard, and 45% Qest, and pipe that was 100% Vanguard. The **Pops** had fittings that were 60% Vanguard and 40% Qest, and pipe that was 100% Vanguard. The **Rileys** had fittings that were 91% Admiral Marine and 9% Qest, and pipe that was 100% Vanguard. **Jeffrey Schultz** had fittings that were 50% Vanguard and 50% Qest, and pipe that was 100% Vanguard. The **Sisks** had fittings that were 63% White, 26% Vanguard, and 11% Qest, and pipe that was 25% Vanguard and 75% Wrightway. The **Stanfills** had fittings that were 5% Vanguard, and 95% Qest, and pipe that was 100% Qest. **Terdin and Sykora** had fittings that were 90% Vanguard and 10% Qest, and pipe that was 100% Vanguard. The **Turners** had fittings that were 50% Vanguard and 50% Qest, and pipe that was 100% Vanguard. The **Loves** had fittings that were 67% Vanguard and 33% Qest, and the pipe maker was not specified. (We consider the Loves under this point of error even though we have found their negligence cause of action barred by limitations.)

failures was chemical attack, although he conceded that undersized fittings and pressure on the fittings from bending the pipe could also lead to failure. Vanguard returned approximately 40 fittings to Celanese for analysis of chemical attack. Miller acknowledged that there were many instances of leaks caused by a plumber overcrimping or undercrimping. An exhibit was introduced showing that Vanguard had changed its installation procedures and tool design to "take much of the guesswork away from the plumber." Chantos, a manufacturer's representative for Vanguard, testified that he represented Vanguard's polybutylene plumbing system as suitable for residential use, corrosion resistant, and able to withstand the tough water in the Houston area. He spoke to builders and code bodies.

U.S. Brass marked its fittings with a "Q" and Vanguard marked its fittings with an "SG." Bergherr, who replaced defective fittings in homes built by Wood Brothers, testified the fittings could be identified.

U.S. Brass cites to the record and states there is no evidence to show it was U.S. Brass' fittings, as opposed to Vanguard's fittings, that leaked. If there is not, the negligence of U.S. Brass could not be a proximate cause of damage to the exclusion of Vanguard, because the Vanguard polybutylene plumbing system was similar to that of U.S. Brass and the experience of Vanguard concerning failed fittings not unlike that of U.S. Brass.

Homeowner John Barrett testified about where the leaks in their home and garage occurred. He identified [30] a couple of fittings that leaked and were removed from the home, but there is no indication whether they were U.S. Brass or Vanguard fittings, or even Admiral Marine fittings, which comprised 54 percent of the fittings in the home. His testimony does not indicate what caused the leaks: e.g., cracked fittings, pipe failures, or the pipe pulling away from the fitting. It cannot be determined from his testimony whether the leaks caused the same damage to the home.

Cynthia Bengston testified that they had leaks occur in a T-fitting between the bar area and laundry, because of a split pipe bent around a window, in four T-fittings in the attic, in an elbow fitting in a closet, as a result of another split pipe, in a T-fitting located between two bathrooms, in an elbow fitting in the bathroom, and a coupler in the shower. A plumber sent out by U.S. Brass in response to the Bengstons' telephone inquiry said all their plumbing was U.S. Brass. However, when the home was inspected a second time, it was found to contain only 30 percent U.S. Brass fittings, a conclusion that was accepted by the Bengstons. There is no indication about which company had manufactured which failed fitting. Bengston was able to attribute specific damage to specific leaks. Bergherr, an independent contractor for the homebuilder, Wood Brothers, who repaired broken fittings in homes built by Wood Brothers on behalf of the homebuilder, testified that he removed either Vanguard or U.S. Brass fittings from the Bengston home. Initially, Bergherr gave the fittings to counsel for Wood Brothers, but after the homeowners retained legal counsel, he gave the fittings to their attorney.

Gilbert Bennett testified that their first major leak occurred at a "joint." He replumbed the area, putting in copper pipe. He stated his second leak happened beneath the kitchen sink, and he replumbed that area, also with copper. The Bennett home contained 50 percent Vanguard and 50 percent Qest fittings. He was not asked, and did not state, what company had made the fittings that leaked.

Pauline Borski testified that she had four leaks and described where they had occurred in the house. She identified fittings as coming from her home. There is no indication that the leaks were caused by failed fittings or, if so, about which company had manufactured the fittings. Her fittings were 62 percent Vanguard, 23 percent U.S. Brass, and 15 percent Admiral Marine. She was able to attribute specific damage to specific leaks.

Joe Cantu testified generally that their home had leaks. He did not describe where in the house they occurred or whether they

---

30. All fittings that were identified by home- owners were introduced into evidence.

were a result of cracked fittings or split pipe. He identified one of the fittings that had failed and that was removed from the house. There is no indication about which company had manufactured the failed fitting. His testimony indicated that damage from the leaks was centralized in certain areas of the house.

Kathy Dingle testified that their first leak occurred when a main pipe disconnected, and another leak occurred when a pipe came out of the hot water heater in the garage. She identified one of the sets of fittings that was removed from their home. There was an indication that two failed fittings used at her deposition were Vanguard fittings, but otherwise there was no testimony about who manufactured the failed fittings.

Kurt Ditges testified that water was everywhere in their house as a result of one or two of the original leaks. He did not say if the leaks were caused by cracked fittings or split pipes, but he identified various broken fittings that had been removed from the house. There was no testimony about who manufactured the broken fittings.

Annie Farris testified that the first leak occurred at the main cut off in the front yard. Another leak happened in the house when a pipe separated. There was no other testimony about what caused the leaks. She identified one fitting that had been removed from the house. The house had been replumbed, and she had saved many of the fittings. There was no testimony about who manufactured the fittings.

James Fish testified that his first two leaks were caused by a cracked white plastic fitting. His third leak was in a gray fitting. He identified two of the failed fittings, and they were passed to the jury. Two of the leaks occurred in the same area. There is no testimony about who manufactured the fittings.

Charles Jackson identified several fittings that came out of their house, and they were tendered to the jury. He said that there were leaks from the pipe as well as from the fittings. The testimony indicates that some of the leaks damaged the same areas of the house. There is no testimony about who manufactured the fittings, but the damage summary indicates that the pipe was made by U.S. Brass.

From John Langman's testimony, it appears that all the leaks caused damage in the same area. He identified several sacks of fittings as fittings from his home. There was no testimony about who made the fittings.

Tammie Love testified that they had two leaks. One flooded the dining room and one flooded the kitchen. One of the leaks was caused by a hole in a pipe from a nail being driven into it; the other appeared to have been caused by a bad crimp. There was no testimony about who made the fittings.

John Pop did not indicate if their leaks occurred because of failed fittings or cracked pipes. There was no testimony about who made the fittings, although the damage summary showed that the pipe was made by Vanguard. His testimony indicates their leaks caused separate damages.

Charles Riley identified one of the leaking fittings that was removed from their mobile home. He testified his leaks had all happened in fittings, not the pipes. He said he did not know if the Admiral or U.S. Brass fittings leaked. While he did not attribute specific damages to specific leaks, he did say that five of the 14 leaks caused flooding in the home.

Jeffrey Schultz testified that all of his leaks involved fittings. He said it was not possible for him to tell who made a particular fitting. He identified two bags of fittings as coming from his home, but the manufacturer was not identified. He stated that his house was small and it did not take much water to seep all over it.

Allison Sisk testified that their house contained Vanguard, U.S. Brass, and Wrightway products. She said she could not tell if a U.S. Brass product leaked and caused the damage in the home. Her testimony does not indicate if the leaks occurred as a result of cracked fittings or split pipes or pipes that pulled away. She did not attribute specific damage to specific leaks.

Kevin Stanfill identified several defective fittings that had been removed from their house. His testimony does not indicate who made the fittings. As in the case of the

Bengston home, Bergherr testified that he removed either Vanguard or U.S. Brass fittings from the Stanfill home. Initially, Bergherr gave the fittings to counsel for Wood Brothers, but after the homeowners retained legal counsel, he gave the fittings to their attorney.

M.C. Terdin identified several fittings that were removed from their home. His testimony does not indicate who made the fittings, or even if all the leaks were caused by cracked fittings. His testimony does show that some leaks damaged the same areas in the home.

Tenisa Turner identified pieces of pipe taken out of the house that had leaked; the pipe pieces were tendered to the jury. She testified one leak was the result of the cracked pipe. The Turners' pipes were 100 percent Vanguard according to their damage summary. She also identified pieces of a failed fitting that caused a leak, and the pieces were tendered to the jury. There was no indication if the fitting was made by Vanguard or U.S. Brass. Her testimony shows that some of the leaks damaged the same areas in the house.

We conclude that there was no evidence from which the jury could have determined that fittings and pipe made by U.S. Brass, to the exclusion of those made by Vanguard, leaked and caused damages to the homes and personal property of the 19 appellants discussed under this cross-point.

We sustain U.S. Brass' second cross-point, except as it concerns the Loves, whose negligence cause of action we have found barred by limitations.

■ Similar to its argument in cross-point two, in its third cross-point, U.S. Brass contends the trial court did not err in disregarding the jury's finding to question five (what sum of money would compensate the plaintiffs for the defendants' violations of the DTPA) because there is no evidence to prove the causation of damages to the homes of 19 of the appellants [31] or their personal property. We interpret U.S. Brass' cross-point as arguing there is no evidence to support the jury's allocation of liability in response to question 5A, or the exclusion of Admiral Marine and Wrightway from liability, because none of the evidence shows whether the leaks came from U.S. Brass, Vanguard, Admiral Marine, or Wrightway fittings. We discuss this cross-point only as it relates to those of the 19 for whom we sustained the appellants' third point of error: the Farrises, the Fishes, John Langman, and the Loves.[32]

In their eleventh amended original petition, the plaintiffs asserted that U.S. Brass, Vanguard, Admiral Marine, and other manufacturers of the plumbing components violated the DTPA by: (1) representing the goods or services had sponsorship, approval, characteristics, uses, and benefits that they did not have; (2) representing the goods or services were of a particular standard, quality, or grade, when in fact, they were of another; and (3) failing to disclose information concerning the goods or services that were known at the time of the transaction and such failure to disclose information was intended to induce consumers, including the plaintiffs, into a transaction into which they would not have entered had the information been disclosed.

The jury was asked (in questions one and 1A) whether the deceptive practices or unconscionable actions of Shell, Celanese, U.S. Brass, or Vanguard were a producing cause of damage to the Farrises and the Loves. The jury answered affirmatively for all defendants. For both the Farrises and the Loves, the jury allocated 15 percent of the liability to U.S. Brass and 15 percent to Vanguard.

31. The 19 appellants are those discussed in connection with U.S. Brass' cross-point two. See note 29.

32. The Farrises had fittings that were 50% Vanguard and 50% Qest, and the pipe maker was not specified. The Fishes had fittings that were 90% White and 10% Qest, and pipe that was 100% Qest. John Langman had fittings that were 33%
Admiral Marine, 22% Vanguard, and 45% Qest, and pipe that was 100% Vanguard. The Loves had fittings that were 67% Vanguard and 33% Qest, and the pipe maker was not specified. We also sustained the appellants' third point of error on the Casiases and Christensens, but U.S. Brass does not address this cross-point to them.

With respect to John Langman, question one asked if the deceptive practices of Shell, Celanese, U.S. Brass, Vanguard, and Admiral Marine were a producing cause of damage to him. The jury answered "yes" to Shell, Celanese, U.S. Brass, and Vanguard, but "no" to Admiral Marine. Question 1A asked if the unconscionable actions of Shell, Celanese, U.S. Brass, and Vanguard were a producing cause of damage to John Langman. The jury answered "yes" to all defendants. The jury allocated 20 percent of the liability to U.S. Brass, 10 percent to Vanguard, and none to Admiral Marine.

For the Fishes, the jury found the deceptive practices and unconscionable actions of Shell, Celanese, and U.S. Brass were a producing cause of damage, but answered the same questions negatively for defendant Wrightway. The jury allocated 30 percent of the liability to U.S. Brass and none to Wrightway.

We discussed the testimony of the Farrises, the Fishes, John Langman, and the Loves in connection with U.S. Brass' second cross-point.

We conclude there is no evidence from which the jury could have allocated the liability as it did between U.S. Brass and Vanguard,[33] or excluded Wrightway and Admiral Marine from liability. Accordingly, we sustain U.S. Brass' third cross-point, that there was no evidence of causation of damage to the homes and personal property of the Farrises, the Fishes, John Langman, and the Loves.

■■■ In cross-point four, in connection with the appellants' DTPA cause of action, U.S. Brass argues the trial court erred in excluding evidence of its settlement letter offers made to 15 of the appellants[34] to underwrite the cost of replumbing their homes and to reimburse them for other damages.

■■■ As U.S. Brass acknowledges, generally, offers of settlement are not admissible in evidence. *LaCoure v. LaCoure,* 820 S.W.2d 228, 235–36 (Tex.App.—El Paso 1991, writ denied); *Evans v. Covington,* 795 S.W.2d 806, 808 (Tex.App.—Texarkana 1990, no writ); *Duval County Ranch Co. v. Alamo Lumber Co.,* 663 S.W.2d 627, 633 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.). Rule 408 of the Texas Rules of Civil Evidence provides:

> *Evidence of* (1) *furnishing* or *offering* or *promising to furnish ... a valuable consideration in compromising* or *attempting to compromise a claim which was disputed as to either validity or amount* is *not admissible to prove liability for, or invalidity of, the claim or its amount.... This rule also does not require exclusion when the evidence is offered for another purpose,* such as proving bias or prejudice or interest of a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

(Emphasis added.) Rule 408 does not require exclusion of the evidence when offered for a purpose other than that of proving liability for or invalidity of the claim or its amount. The issue is how far can this exception to the rule be extended before it overcomes the policy underlying the rule. *See Ramada Dev. Co. v. Rauch,* 644 F.2d 1097, 1107 (5th Cir.1981).[35]

U.S. Brass cites to *Portland Savings and Loan Association v. Bernstein,* 716 S.W.2d 532 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986), for the proposition that the "other purposes" enumerated in rule 408 are not exclusive. *Bern-*

---

**33.** This cause was filed before September 1, 1989. Before that date, contribution rights under the DTPA are governed by chapter 32 of the Texas Civil Practice and Remedies Code. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 6 n. 7 (Tex.1991). The parties do not brief or argue this matter.

**34.** Barrett, Borski, Casias, Christensen, Dingle, Ditges, Farris, Fish, Jackson, Langman, Love, Reaux, Schultz, Sisk, and Stanfill.

**35.** Rule 408 of the Federal Rules of Evidence is identical to Tex.R.Civ.Evid. 408. Accordingly, we consult cases interpreting federal rule 408 for guidance about the scope and applicability of our Texas rule. *See Cole v. State,* 839 S.W.2d 798, 801 (Tex.Crim.App.1990).

*stein* was an appeal from an order sustaining the appellees' special appearance. *Id.* at 534. Under the provisions of the Texas long-arm statute, there must be proof that the allegedly tortious act was committed in Texas, but ultimate liability in tort is *not* a jurisdictional fact, and the merits of the cause of action are not at issue. *Id.* at 536. It is within this context that the Corpus Christi Court of Appeals stated:

> By cross-point, appellees argue that these negotiations [for the return of GNMA securities, in which Bernstein participated through letters, calls, and a visit to Texas] are privileged under TEX.R.CIV.EVID. 408.... However, "[t]his rule also does not require exclusion when the evidence is offered for another purpose...." TEX. R.CIV.EVID. 408. The evidence of the negotiations between appellant and Legel Braswell [represented by Bernstein] was not admitted to prove liability for the claim; rather, it was to show the statements which were alleged to be misrepresentations. Appellees' cross-point is overruled.

*Bernstein,* 716 S.W.2d at 537. In short, evidence of the negotiations was introduced not to show liability, but to establish in personam jurisdiction over Bernstein under the Texas long-arm statute.

When U.S. Brass made its offers of proof regarding the letters to these 15 appellants, it argued variously that the letters were relevant on mental anguish damages, unconscionability, causes of action, or the several issues involved or suggested that they were being utilized as rebuttal evidence. On appeal, U.S. Brass asserts the offers of settlement were admissible to rebut the appellants' testimony regarding the alleged inadequacies of Shell's later offer, to show that U.S. Brass did not act unconscionably, and to show the appellants' failure to mitigate their damages. In short, U.S. Brass sought to introduce its offers of settlement to directly defeat its alleged liability and the amount of damages claimed. This is not the offering of evidence under rule 408 for "another purpose," and is in derogation of the rule 408 prohibition against admitting evidence of offers of settlement for the purpose of proving

liability for, or invalidity of, the claim or its amount.

We also note that the DTPA provides a mechanism for a defendant to use a settlement offer to "mitigate" damages. Under section 17.505(c), any person who receives notice of a consumer's DTPA claim under section 17.505(a) may tender to the consumer a written settlement offer within a specified period of time. TEX.BUS. & COM.CODE ANN. § 17.505(a), (c) (Vernon Supp.1993). If rejected, the settlement offer may be filed with the court along with an affidavit certifying its rejection. TEX.BUS. & COM.CODE ANN. § 17.-505(d) (Vernon Supp.1993). If the amount tendered in the settlement offer is the same as or more than, or if the court finds the amount to be "substantially the same" as, the actual damages awarded by the fact finder, the consumer may not recover an amount in excess of the amount tendered in the settlement offer or the amount of actual damages found by the fact finder, whichever is less. TEX.BUS. & COM.CODE ANN. § 17.505(d). But section 17.505(d) specifically states that the settlement offer is not admissible as evidence before a jury. The record does not show that U.S. Brass chose to use this "mitigation" mechanism.

We conclude the trial court did not err in excluding U.S. Brass' letters of settlement as evidence, and overrule U.S. Brass' fourth cross-point.

In cross-point five, U.S. Brass asserts the trial court did not err in disregarding the jury's answer to question three, that the violations of the DTPA occurred before August 27, 1979, because there was no evidence that any violations occurred before August 27, 1979. We sustain this cross-point for the reasons discussed in connection with the appellants' point of error six.

In its sixth cross-point, U.S. Brass argues there was no evidence or, alternatively insufficient evidence, to support the jury's finding of no discovery with respect to six of the appellants. Jury question four asked:

> Do you find that [plaintiffs' names] did not discover sufficient facts, nor in the exercise of reasonable diligence should have discovered sufficient facts, to put them on notice of the false, misleading, or deceptive act(s)

or practice(s), or the unconscionable action or course of action, if any, before [the date two years before they filed suit]?

 Because of our disposition of the appellants' points of error three and four and because U.S. Brass raises this point with respect to only certain appellants, we address this point of error only to the Casiases, the Fishes, and the Loves.

The DTPA contains the following statute of limitations:

All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or *in the exercise of reasonable diligence should have discovered* the occurrence of the false, misleading, or deceptive acts or practice.....

TEX.BUS. & COM.CODE ANN. § 17.565 (Vernon 1987). The DTPA's limitations provision incorporates the discovery rule. *Willis v. Maverick,* 760 S.W.2d 642, 647 (Tex.1988). Under the discovery rule, the plaintiff has the burden to plead, prove, and secure favorable findings. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988); *Willis,* 760 S.W.2d at 647.

U.S. Brass concedes that there may be some evidence that the appellants did not discover the alleged violations of the DTPA by it during the two-year period before they filed suit. However, U.S. Brass contends there is evidence that the appellants, *in the exercise of reasonable diligence, should have discovered* the alleged occurrence of the false, misleading, or deceptive act.

 In reviewing "no evidence" points, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Davis,* 752 S.W.2d at 522. If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman,* 760 S.W.2d at 242. When we review the factual sufficiency challenges, we examine all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *Glockzin v.*

*Rhea,* 760 S.W.2d 665, 666 (Tex.App.—Houston [1st Dist.] 1988, writ denied). We will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ).

 The Casiases filed suit on August 25, 1988. They bought their home in 1984, and they experienced their first three leaks in September 1984, July 1985, and August 1985. Louie Casias testified that he brought suit within two years of the time he learned of the false, misleading, and deceptive acts or practices of U.S. Brass, and within two years of the time he learned their plumbing system was defective. He decided he had a defective plumbing system in October 1988 when he was at a homeowners' meeting. While this is some evidence of probative force to support the jury's finding that the Casiases did not discover sufficient facts to put them on notice of potential DTPA violations before August 25, 1986, there is no evidence that in the exercise of reasonable diligence, they should not have discovered such sufficient facts by that date.

Moreover, Casias also testified he recalled stating in his deposition, that in 1984 he became aware of problems with the plumbing from a neighbor, who told him he had seen water running out of the garage and that there had been a leak near the water heater before the Casiases purchased the house. He stated that he said to himself in 1984 that the plumbing "is not worth a damn." Based on all of Louie Casias' testimony, we conclude the great weight and preponderance of the evidence shows that the Casiases, in the exercise of reasonable diligence, should have discovered before August 25, 1986, sufficient facts to put them on notice of the alleged violations of the DTPA.

 The Fishes filed suit on October 31, 1988. They bought their home in July 1982, and the first leak occurred in April 1986. Their second and third leaks happened in 1987 and 1988. James Fish testified that he

first learned of the false, misleading, or deceptive acts or practices of U.S. Brass in July 1988. He said they had come back from vacation, and a neighbor told him "that some of the neighbors had gotten together about the pipes." He also said he learned of the cause of the problems with the polybutylene plumbing system after July 1988. While this is some evidence of probative force to support the jury's finding that the Fishes did not discover sufficient facts to put them on notice of potential DTPA violations before October 18, 1986, there is no evidence that in the exercise of reasonable diligence, they should not have discovered such sufficient facts by that date.

Moreover, Fish acknowledged that he sent a certified letter to their homebuilder, Great American, on September 18, 1986 (more than two years before they filed suit) complaining of the plumbing system and stating that they would sue Great American if they did not respond. The letter was admitted into evidence and, among other things stated, that a "T" fitting in a hot water line had split; that the split was the same as that in a former neighbor's home; that he had learned of 10 other similar cases within a one-block area of their home; that personnel at home improvement and plumbing stores had told him the fitting was of the kind used for cold water lines in mobile homes and was not made to withstand the high temperature of hot water lines; and that a licensed plumber had warned him it was just a matter of time before other fittings in their home would split. Based on all of James Fish's testimony, we conclude that the great weight and preponderance of the evidence shows the Fishes in the exercise of reasonable diligence should have discovered before October 18, 1986, sufficient facts to put them on notice of the alleged violations of the DTPA.

▆ The Loves filed suit on December 22, 1988. They bought their home in May 1983, and have had only two leaks, one in February 1985 and one in March 1986. Tammie Love testified that they brought suit within two years of the time they discovered the cause of the leaks, in December 1988. She stated they learned of the cause at a neighborhood meeting. While this is some

evidence of probative force to support the jury's finding that the Loves did not discover sufficient facts to put them on notice of potential DTPA violations before December 22, 1986, there is no evidence that in the exercise of reasonable diligence, they should not have discovered such sufficient facts by that date.

Moreover, she also testified that when she asked Crown Plumbing to fix the second leak, they told her they were unable to do so because that type of plumbing was "substandard." Based on all of Tammie Love's testimony, we conclude that the Loves in the exercise of reasonable diligence should have discovered before December 22, 1986, sufficient facts to put them on notice of the alleged violations of the DTPA.

We sustain the sixth cross-point of U.S. Brass with respect to the Casiases, Fishes, and Loves.

▆ In its seventh cross-point, U.S. Brass contends there is no evidence, or alternatively the evidence is factually insufficient to support the jury's finding that it knowingly violated the DTPA. We discuss this point of error because of our conclusion that the Christensens and the Reauxes may recover under their DTPA cause of action.

"Knowingly" means an actual awareness of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim. TEX.BUS. & COM.CODE ANN. § 17.45(9) (Vernon 1987). Section 17.50(b)(1) authorizes the trier of fact to award not more than three times the amount of actual damages in excess of $1,000 if the defendant's violations of the DTPA are committed knowingly.

Representatives of U.S. Brass and its plumbing catalogs advertised that the polybutylene plumbing system would not corrode and would have a normal life of 50 years.

Watson, a former U.S. Brass plant manager, testified by deposition that he knew in the 1960's that chlorine-containing compounds could attack Celcon. He also testified that he knew in the 1970's that chlorine was in drinking water and that, in some parts of the country, potable water was aggressive and could attack Celcon. Tripp, a former U.S. Brass product development specialist on the west coast, testified by deposition that he

summarized, in his January 1982, report, problems with the U.S. Brass polybutylene plumbing system. He also testified that a person who reported to his supervisor requested him to destroy the last page of the report because it was somewhat damaging to the company. The last page called for a serious research effort to perfect the fittings, tools, and rings.

The testimony of Watson and Tripp constitutes some evidence entitling the jury to find that U.S. Brass knew that its polybutylene plumbing system might be subject to corrosion and might not have a life span of 50 years; therefore, there is some support for the jury finding that U.S. Brass knowingly violated the DTPA. Accordingly, we overrule the "no evidence" portion of U.S. Brass' seventh cross-point.

We also find the evidence factually sufficient to support the jury's "knowingly" finding.

Watson testified that U.S. Brass and Celanese worked closely in developing the Celcon fittings, and that Celanese never expressed any reservations about the use of Celcon with potable water systems. He said that U.S. Brass relied on the data from Celanese in running its tests and making its calculations. McAndrew of Celanese testified by deposition that Celanese never concluded that U.S. Brass was using Celcon in plumbing applications that it should not.

According to Watson, U.S. Brass relied on Celanese with regard to the suitability of Celcon, and that it was not until 1981 that Celanese provided a numerical limit on chlorine. Watson testified that U.S. Brass had concerns in late 1980 about Celcon because of returns and field reports. He and other U.S. Brass representatives met with Celanese representatives (including McAndrew and Dotson) in November 1980 seeking additional information and clarification. According to Watson, Celanese assured them that Celcon was a good product, that it was continuing to improve it, and that it would see if there was any further information that could be shared with U.S. Brass.

After the meeting, on January 28, 1981, Dotson sent a letter to Watson, which read in pertinent part as follows:

> We have not recommended that Celcon$^R$ be used in applications that require continuous exposure to steam or water above 180°F or in acid conditions below pH 4. It is not recommended that Celcon$^R$ be used in plumbing of high temperature closed looped systems, applications in which the water remains virtually stagnant for very long periods. *Examples of these applications are baseboard heating, solar heating primary circuits, etc. . . . Where such unusual water conditions of service are anticipated, we recommend that thorough testing of Celcon$^R$ be carried out prior to installations.*
>
> Celcon$^R$ has proved its reliability for the past eighteen years for use in water systems where the water is frequently changed in normal use such as in domestic hot and cold water supplies. In these installations, Celcon$^R$ performs well within the end use requirements of the plumbing industry when designed and fabricated according to good manufacturing guidelines.
>
> *The use of Celcon$^R$ is also not recommended for plumbing applications involving high chlorine/water environments.* An example is plumbing of swimming pools. . . . *As a rule of thumb, we do not recommend extended exposure to chlorine levels which exceed 1 ppm due to the possible adverse effects on Celcon$^R$. . . .*
>
> *Although municipal and household water supplies are treated with chlorine, the low levels, approximately 0.2 ppm, should not pose any problems for Celcon$^R$ parts.* During the many years of Celcon$^R$ usage in household plumbing applications, there is no evidence available which suggest that chlorine at these levels has resulted in premature part failure.

(Emphasis added.) Dotson discussed the letter with Wilson, also of Celanese, before he sent it. The technical information came from Wilson. Watson's testimony indicates that the only information in the letter that was new to him was the one part per million (ppm) limit and the comment on municipal

water supplies. Dotson testified he did not recall speaking to Watson about the letter.

Watson said the reason U.S. Brass warned against a "high chlorine environment" in its literature, as opposed to setting a limitation of one part per million chlorine content on Celcon, was because Celanese assured U.S. Brass that it had no concern about the viability of Celcon in potable water systems. McAndrew testified that he did not know why one ppm was chosen; the testing done by Celanese had shown no effect at 0.2 ppm and some effect at 2.3 ppm. He also stated that high chlorine content was above what was generally found in municipal water systems. Following the January 28 letter, Watson was concerned enough that he conducted his own survey of chlorine levels in municipal water systems in various cities, and contacted Wilson of Celanese to find out at what level chlorine could have deleterious effects on Celcon. According to Watson, the general import of what Wilson told him was that the threshold was in the range of three ppm, which was greater than the chlorine levels Watson had found in his survey. Wilson testified he spoke quite a few times to Watson, but that he did not recall telling Watson not to worry about the one ppm limit, nor would he have done so.

Watson agreed that Celanese warned U.S. Brass in a technical data request in November 1978 to avoid excessively high clamping forces. He also stated that he asked Celanese to rewrite the report to eliminate that warning because he believed Celanese was making determinations without the necessary background and analysis and testing. He testified that anyone taking the time and effort to make the necessary calculations using the data supplied by Celanese would have come up with a different determination, and that U.S. Brass had done so.

Watson testified that the U.S. Brass polybutylene plumbing system had been tested by independent laboratories and listed by the National Sanitation Foundation, the Canadian Standards Association, and the American Society of Testing and Materials.

U.S. Brass relied on Celanese concerning the chemistry of Celcon. The evidence shows that in January 1981, U.S. Brass had a letter from Celanese from which it could be inferred that municipal water systems with a chlorine content of one ppm or more could prove a problem for Celcon. The evidence (the testimony of Watson and Wilson) conflicts whether Celanese later assured U.S. Brass that in fact the chlorine threshold was closer to three ppm, a limit above the chlorine amounts Watson's survey showed various municipalities used in their water supplies. The jury as fact finder decides conflicts in the evidence.

Although U.S. Brass was confident of its ability to make the necessary stress calculations, it had notice from Celanese that excessive clamping forces should be avoided, and that stress as well as chemical attack might have a role in fitting failures. We conclude the jury's finding of a "knowing" violation of the DTPA by U.S. Brass was not against the great weight and preponderance of the evidence.

We overrule the factual insufficiency portion of U.S. Brass' seventh cross-point.

In cross-point eight, U.S. Brass contends there is insufficient evidence that its conduct was a violation of the DTPA. First, U.S. Brass argues it was not engaged in any false, misleading, or deceptive acts or unconscionable actions in connection with a transaction in which the appellants were consumers.˙ Second, U.S. Brass argues it had no contact with the appellants. We overrule these arguments, and cross-point eight, for the reasons discussed above in connection with the appellants' point of error two.

### Conclusions

Because we overruled the eleventh point of error of the appellants, we affirm the take-nothing judgment against Colon–Pomales, Patterson, the Thumanns, and the Yeateses.

We affirm the trial court's judgment notwithstanding the verdict on the DTPA cause of action of the following appellants because we have overruled the appellants' third and fourth points of error as applied to them: the Barretts, Bengstons, Bennetts, Pauline Borski, Cantus, Dingles, Ditgeses, Jacksons, Jacobses, Pops, Rileys, Jeffrey Schultz, Sisks, Stanfills, Terdin and Sykora, and Turners.

We affirm the trial court's judgment notwithstanding the verdict on the DTPA cause of action of the Casises and Fishes because we have sustained the sixth cross-point of U.S. Brass, holding there was no evidence that in the exercise of reasonable diligence they should not have discovered sufficient facts to put them on notice of potential DTPA violations.

Because we have sustained U.S. Brass' second cross-point, that there is no evidence to prove causation of damages to the homes and personal property, as applied to the Barretts, Bengstons, Bennetts, Pauline Borski, Cantus, Dingles, Ditgeses, Fishes, Jacksons, Pops, Rileys, Jeffrey Schultz, Sisks, Stanfills, Terdin and Sykora, and Turners, we reverse the amount of damages awarded them under their negligence cause of action, and remand the judgment on the negligence cause of action of these 16 appellants to the trial court with instructions to re-compute the damages to which these appellants are entitled by deleting any damages awarded by the jury in response to question 9(a) and (b).

Because we have sustained the appellants' third point of error, that there was some evidence that U.S. Brass' misrepresentations were a producing cause of damage, and sustained U.S. Brass' second and third cross-points, that there is no evidence to prove causation of damages to the homes and personal property, as applied to the Farrises and John Langman, we reverse the amount of damages awarded them under their negligence cause of action, reverse the judgment notwithstanding the verdict on the DTPA cause of action, and remand the judgment on the DTPA and negligence causes of action of these appellants to the trial court with instructions to: (1) re-compute the damages to which these appellants are entitled under their DTPA and negligence causes of action respectively, by deleting any damages awarded by the jury in response to questions 5(a) and (b) and 9(a) and (b); (2) award, or allow the Farrises and John Langman to elect, damages under the DTPA theory or negli-

gence theory; and (3) enter judgment accordingly for the Farrises and John Langman.

Because we have sustained the first cross-point of U.S. Brass on the Loves on their negligence cause of action, and the sixth cross-point of U.S. Brass on the Loves on their DTPA cause of action, we reverse the judgment of the trial court and render judgment that the Loves take nothing against U.S. Brass under their negligence and DTPA causes of action.

Because we have sustained the appellants' third point of error with respect to them, we conclude that judgment notwithstanding the verdict should not have been granted against the Christensens and the Reauxes,[36] and we reverse this part of the trial court's judgment. Because U.S. Brass did not attack their recovery under their negligence cause of action, we remand the DTPA and negligence causes of action of the Christensens and Reauxes with instructions to the trial court that it award, or allow them to elect, damages under the negligence theory or the DTPA theory, and enter judgment accordingly.

Except as otherwise provided in this opinion, the judgment of the trial court is affirmed.

DUNN, J., concurring in part and dissenting in part.

DUNN, Justice, concurring and dissenting.

I concur with the majority on all points of error other than the appellee's cross-points of error one, two, and three from which I respectfully dissent.

*Cross-point One*

Initially, I disagree with the majority's finding as to when the cause of action asserted by the appellants accrued. Further, I disagree with the analysis applied by the majority.

---

**36.** These two homes had 100 percent U.S. Brass fittings, and were built by either Fox & Jacobs or Great American, the two homebuilders for which there is some evidence that use of the polybutylene plumbing system was the result of represen-

tations by U.S. Brass. U.S. Brass did not argue with respect to these appellants that the jury finding of "no discovery" was without support in the evidence.

U.S. Brass asserts that the trial court erred in denying U.S. Brass' motion for judgment notwithstanding the verdict with respect to appellants' negligence cause of action and motion to disregard the jury's answers to question numbers 7, 7A, 8, and 9 because it was established as a matter of law that 11 appellants were barred in negligence by the statute of limitations.

Initially, U.S. Brass complains that the discovery rule is not applicable to the negligence causes of action of these 11 appellants, inasmuch as they filed suit more that two years after the date of their first leak and were therefore barred by limitations. U.S. Brass argues that these appellants' negligence cause of action accrued, for the purpose of the statute of limitations, on the date of their first leak, i.e. that the statute of limitations began to run on this date. Therefore, U.S. Brass concludes that the 11 appellants' causes of action for negligence were untimely filed inasmuch the first leak of each of the 11 appellants occurred more than two years before the action was filed.

The date of the accrual of the cause of action is a question of law. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). To determine this date, we must address the cause of action asserted by the plaintiff and the act he complains of. If the act complained of is unlawful, then the injury occurs at the time the act is committed, and the statute of limitations begins to run from the date of the act. *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967). If the act complained of is legal at the time it was committed, then the action does not accrue until the injury occurs. *Id.* A cause of action for negligence accrues when the duty of ordinary care is breached by some act or omission, even though the injury is not immediately apparent, and the plaintiff may be unaware of the cause of action. *American Centennial Ins. Co. v. Canal Ins. Co.,* 810 S.W.2d 246, 255 (Tex.App.—Houston [1st Dist.] 1991), *aff'd in part and rev'd in part,* 843 S.W.2d 480 (Tex.1992). As a general rule, the statute of limitations begins to run from commission of the negligent act, if the negligent act constitutes the invasion of the legally-protected interest of another, even if the one injured is unaware of the negligence. *Metal Structures Corp. v. Plains Textiles, Inc.,* 470 S.W.2d 93, 98 (Tex. Civ.App.—Amarillo 1971, writ ref'd n.r.e.). Therefore, a cause of action for negligence must be brought within two years of the day the duty of ordinary care is breached, even though the injury may not be apparent and the plaintiff may be unaware of the breach.

The discovery rule applies to causes of action that can be characterized as inherently undiscoverable. *Johnson v. Abbey,* 737 S.W.2d 68, 69 (Tex.App.—Houston [14th Dist.] 1987, no writ). The discovery rule is a judicially-created test that acts as an exception to the general rule of accrual for negligence. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 353 (Tex.1990). If the discovery rule applies, the limitations period does not begin until the plaintiff discovers, or through the exercise of reasonable care and diligence should discover, the nature of the injury. *Rose v. Baker & Botts,* 816 S.W.2d 805, 810 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

In this case, the plaintiffs stated a cause of action for negligence against U.S. Brass and the other manufacturers of the plumbing components, asserting that they failed to adequately design the plumbing system; failed to adequately manufacture the plumbing system or its components; failed to adequately inspect or test the plumbing system or its components; failed to give adequate instructions on installation; failed to give any or adequate warnings regarding the limitation of use of the plumbing system or components; and represented the plumbing system was suitable for site-built housing. If their assertions are correct, it is apparent that the duty of ordinary care was breached when the defective plumbing system was installed in the respective homes, even though the injury was not apparent at the time and the plaintiffs were not aware of the breach. Therefore, the cause of action accrued at the time of installation. However, because the parties purchased a completed home, including the defective plumbing system, concealed within the walls of the respective homes, there was no way for them to discover the defects alleged until such time as events occurred from which they would know or should have

known of the alleged breach of duty by the defendants. Therefore, because the plumbing system is concealed, the breach of duty is inherently undiscoverable, and the discovery rule should be applied. *Johnson,* 737 S.W.2d at 69.

It was for the jury to decide, not the majority of the Court, when each plaintiff did discover or should have discovered that he or she had a defective plumbing system as this is an issue of fact. *Coyel v. Mortgage Bond Co.,* 124 S.W.2d 204, 206 (Tex.Civ.App.—Waco 1939, no writ). The jury found, in answering question number eight, that each plaintiff "did not discover, nor in the exercise of reasonable diligence, should have discovered, the negligent conduct of the Defendants." Because U.S. Brass does not assert that this finding is against the great weight of the evidence, the finding of the jury that the plaintiffs' cause of action after application of the discovery rule is within the statute of limitations prevails.

I would overrule cross-point of error one.

### Cross-point Two

In cross-point of error two, U.S. Brass asserts the trial court erred in denying its motion for judgment notwithstanding the verdict and to disregard the jury's answers to question nine (what sum of money would reasonably compensate the plaintiffs for the defendants' negligent conduct) because there is no evidence to prove the causation of damages to the appellants' homes or personal property. U.S. Brass argues that because the appellants offered no evidence to show which leaks were caused by a given manufacturer's product or what damage resulted from those leaks, there is no evidence to support liability for the damages caused by those leaks. I interpret U.S. Brass' point of error to be a complaint that there is no evidence to support the jury's response to question seven that the negligence of the other defendants was a proximate cause of damages to the plaintiffs, but that of Vanguard was not.

I would hold, as the majority does, that there is no evidence to support the finding that the other defendants were negligent to the exclusion of Vanguard. There is evidence in the record that all of the companies were involved in producing the defective plumbing system. However, unlike the majority, I would find that the damage to the property was an indivisible injury, and hold that all four companies are jointly and severally liable, which would necessitate a remand for a determination of comparative liability between the defendants, including Vanguard, which could possibly mean a different percentage attributable to U.S. Brass.

U.S. Brass argues that while the damages for the replacement of the plumbing system and the mental anguish are indivisible injuries, the repairs to the home and the personal property caused by the plumbing system leaks should not be considered in a class of indivisible injuries since the damages were associated with specific leaks. They cite *Century 21 Page One Realty v. Naghad,* 760 S.W.2d 305 (Tex.App.—Texarkana 1988, no writ).

An indivisible injury is "an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers." *Landers v. East Texas Salt Water Disposal Co.,* 151 Tex. 251, 248 S.W.2d 731, 734 (Tex.1952). "Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, . . . all of the wrongdoers will be held jointly and severally liable." *Id.* There is evidence in this case that all four of the companies were involved in the manufacturing of the defective plumbing systems which were installed in each of the respective homes. It is impossible to tell which part of the defective system actually caused each respective leak. The entire system was defective.

The Restatement of Torts states the rule applicable to the facts in this case.

> Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

RESTATEMENT (SECOND) OF TORTS § 433B(2) (1963). Thus, when a defendant has in fact caused harm to the plaintiff, he may not

escape liability merely because the harm he has inflicted had combined with similar harm inflicted by other wrongdoers. *See* RESTATE-MENT (SECOND) OF TORTS § 433B(2) cmt. d (1963).

U.S. Brass asserts that the harm to the appellants can be apportioned between Shell, Celanese, Vanguard, and itself. In this case there is evidence that U.S. Brass, Shell, Celanese and Vanguard were negligent in manufacturing a totally defective plumbing system. This negligence combined to cause injury to the appellants. Damage to each home due to this negligence was proven to the extent necessary under the indivisible injury theory. Therefore, the burden shifted to the defendants to apportion the damages among themselves as set out herein above in the Restatement (Second) of Torts.

I would sustain cross-point two as to Vanguard, and I would remand this cause to the trial court for a redetermination of apportionment of damages among the four defendants.

### Cross-point Three

In cross-point of error three, U.S. Brass asserts that the trial court did not err in disregarding question number five (regarding what sum of money would compensate the plaintiffs for the defendants' violation of the DTPA) because there is no evidence to prove the causation of damages to the appellants' homes or personal property. I interpret this cross-point as arguing there is no evidence to support the jury's allocation of liability in response to question 5A, or the exclusion of Admiral Marine and Wrightway from liability, because none of the evidence shows whether the leaks came from U.S. Brass, Vanguard, Admiral Marine, or Wrightway fittings.

Again, I would hold, as the majority does, that there is no evidence to support a holding of liability against U.S. Brass and Vanguard to the exclusion of Wrightway and Admiral Marine. However, for the reasons set out in my dissent from cross-point two, I would find that the appellants' injuries were indivisible. I would hold that all four companies are jointly and severally liable in accordance with chapter 32 of the Texas Civil Practice and

Remedies Code and render judgment accordingly.

## OPINION ON MOTION FOR REHEARING

In its motion for rehearing, among other things, appellee, U.S. Brass, argues that where a trial court judgment is affirmed in part and reversed in part by the court of appeals, as happened here, costs should not be taxed totally against the appellee. *See Walker v. Walker*, 619 S.W.2d 196, 199 (Tex. Civ.App.—Tyler 1981, writ ref'd n.r.e.); *Pundt v. McNeill*, 502 S.W.2d 904, 905 (Tex. Civ.App.—Corpus Christi 1973, no writ); TEX.R.APP.P. 89. We agree. Accordingly, the costs of this appeal will be assessed equally against appellee and appellants, Barrett et al. We **OVERRULE** U.S. Brass' motion for rehearing.

In their motion for rehearing, among other things, appellants, Barrett et al., interpret our overruling of U.S. Brass' seventh cross-point of error as applying only to the Christensens and Reauxes. In its seventh cross-point, U.S. Brass contended there was no evidence or factually insufficient evidence to support the jury's finding that it knowingly violated the DTPA. The cross-point was general. U.S. Brass did not limit its cross-point to certain homeowners. We overruled the cross-point generally, not only as to the Christensen and Reauxes. We **OVERRULE** appellants' motion for rehearing.

DUNN, J., agrees with the majority concerning the clarification relating to cross-point seven, but would grant the motion for rehearing for the reasons expressed in her dissenting opinion and allocate costs 75 percent against appellee and 25 percent against appellants.